672 So.2d 420 (1996)
Darwin STEADMAN
v.
GEORGIA-PACIFIC CORPORATION.
No. 95 CA 1463.
Court of Appeal of Louisiana, First Circuit.
April 6, 1996.
Rehearing Denied May 8, 1996.
*421 Clayton Perkins, St. Francisville, for Plaintiff-Appellant Darwin Steadman.
Thomas Peak, Baton Rouge, for Intervenor Brown & Root, Inc.
Vance Gibbs, Baton Rouge, for Defendant, Appellee Georgia-Pacific Corporation.
Before CARTER and PITCHER, JJ., and CRAIN, J. Pro Tem.[1]
PITCHER, Judge.
In this personal injury action, Darwin Steadman appeals from a jury's determination of fault and damages and the trial court's assessment of costs. We affirm.

*422 FACTS
On May 26, 1988, Darwin Steadman (Mr. Steadman) was employed by Brown & Root USA, Incorporated (Brown & Root). Mr. Steadman was working as a journeyman electrician at the plant site of Georgia-Pacific Corporation (Georgia-Pacific) in Port Hudson, Louisiana. As the journeyman electrician, Mr. Steadman was in charge of and assisting a crew of fourteen men in pulling cable and wire through the Number 2 Pulp Mill Brown Stock area of the plant site. While proceeding through this area of the plant, Mr. Steadman fell, as the handrail he was holding onto for balance broke free from its posts.
As a result of the fall, Mr. Steadman sustained a heel fracture (comminuted calcaneal fracture) and was seen by several physicians. Because of this injury, Mr. Steadman received workers' compensation benefits for ten weeks from Highlands Insurance Company, Brown & Root's insurer. Thereafter, Mr. Steadman's fracture healed, but he developed subtalar arthritis in his subtalar joint, which caused him chronic ankle pain.

PROCEDURAL HISTORY
On May 26, 1989, Mr. Steadman filed a petition for damages, naming Georgia-Pacific as the defendant. On July 11, 1989, Georgia-Pacific filed an answer. Subsequently, Georgia-Pacific filed a third party demand against Brown & Root, alleging that Brown & Root had assumed the custody and control of all labor, materials, equipment, supplies and other things incident to Brown & Root's work at Georgia-Pacific's facility. Georgia-Pacific also alleged that Brown & Root obligated itself to exert all reasonable efforts to provide for the safety of its employees. Brown & Root filed an answer to the third party demand on November 2, 1993. On December 5, 1994, Brown & Root and its compensation insurer, Highlands Insurance Company, filed a petition for intervention. In the petition for intervention, Brown & Root sought the recovery of medical expenses and workers' compensation benefits paid to Mr. Steadman for his work-related injury. Trial was scheduled for December 6, 1994.
Prior to trial, the parties stipulated that the amount of $15,209.27 had been paid for past workers' compensation medical expenses and the amount of $2,760.00 paid for past workers' compensation weekly benefits. The parties stipulated that these medical expenses and workers' compensation benefits would be paid to Highlands Insurance Company from any damages recovered by Mr. Steadman. Thereafter, Georgia-Pacific withdrew its third party demand against Brown & Root. Georgia-Pacific stipulated that it (Georgia-Pacific) had custody and control of the railing and ladder at the time of the accident. Georgia-Pacific also stipulated that it (Georgia-Pacific) was a cause of Mr. Steadman's accident. In this stipulation, Georgia-Pacific reserved the right to assert as a defense the comparative fault of Mr. Steadman.
Following the trial, the jury returned a verdict, assessing Mr. Steadman with 50% of the fault and Georgia-Pacific with 50% of the fault. The jury awarded the following damages: $40,000.00 for general damages, $35,000.00 for future medical expenses, and $15,209.25 for past medical expenses. In the judgment, the trial court set expert witness fees and assessed costs equally between Mr. Steadman and Georgia-Pacific. Mr. Steadman appeals and alleges the following assignments of error:
1. The jury was clearly wrong and committed manifest error in assigning 50% of the fault to Mr. Steadman.
2. The jury erred in returning a general damage award for pain and suffering which was disproportionate to the law and evidence. The general damages award was insufficient.
3. The jury erred in not awarding Mr. Steadman lost future earnings/lost future earning capacity.
4. It was error for the court to have assessed cost[s] equally between Mr. Steadman and Georgia-Pacific.

COMPARATIVE NEGLIGENCE
Through assignment of error number one, Mr. Steadman contends that the jury was *423 clearly wrong and committed manifest error in assigning 50% of the fault to him.
It is well settled that the allocation of comparative negligence is a factual matter within the discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Daigle v. Legendre, 619 So.2d 836, 840 (La. App. 1st Cir.), writ denied, 625 So.2d 1040 (La.1993).
The Louisiana Supreme Court, in Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La. 1985), set forth the guidelines for apportioning fault under the doctrine of comparative negligence. The court stated the following:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d at 974. In assessing the nature of the conduct of the parties, the court listed various factors which may influence the degree of fault assigned, including (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d at 974.
As stated previously, prior to trial, Georgia-Pacific stipulated that it had custody and control of the ladder, and that it (Georgia-Pacific) was the cause of Mr. Steadman's accident resulting in injury. However, Georgia-Pacific asserted the defense of comparative negligence. Georgia-Pacific contends that at the time of the fall, Mr. Steadman was moving along the ledge on the outside of the railing, contrary to the standards of the Occupational Safety and Health Administration (OSHA), placing himself in a position of danger.
Mr. Steadman testified that his job duties as journeyman electrician consisted of working with a crew of fourteen men, pulling cable/wire from one end of Georgia-Pacific's plant to the other end. Mr. Steadman would walk along the line of crewmen and inform each crew member when it was time to begin pulling the cable/wire. On the day of the accident, Mr. Steadman was attempting to communicate instructions to men in the crew. Mr. Steadman stated that he climbed up a six foot ladder, walked across a walkway and spoke with a member of his crew, Octave MacDonald (Mr. MacDonald). After speaking with Mr. MacDonald, Mr. Steadman walked back down the walkway to speak with the next member of the crew. Upon arriving at the ladder, Mr. Steadman backed up and started down the ladder.
According to Mr. Steadman, as he started down the ladder, he put both feet on the top rung of the ladder, and he grabbed the extensions on each side of the ladder. Mr. Steadman stated that these extensions on the ladder were slimy, unsupported and shaky, so he grabbed a handrail for support. The handrail was not connected to the ladder and was about six inches away from the ladder. After grabbing the handrail, Mr. Steadman started down the ladder and leaned back. Upon leaning back, the handrail broke off, and Mr. Steadman fell from the ladder onto his left heel.
Mr. Steadman stated that prior to the accident, he had been in this area several times and had used the handrail-ladder method on other trips up the ladder. Mr. Steadman testified that before attempting to descend the ladder, he walked along the inside of the handrail on a three foot wide walkway as opposed to walking on the outside of the handrail along the ledge.
Mr. MacDonald, an eyewitness to the accident, was deposed on three separate occasions: July 21, 1992; March 2, 1993; and June 8, 1994. At the trial, excerpts from Mr. MacDonald's first (July 21, 1992) deposition and all of his third (June 8, 1994) deposition were introduced into evidence. In his third deposition, on direct examination, Mr. MacDonald's testimony regarding the accident *424 substantially corroborated the testimony of Mr. Steadman.
However, on cross examination, Mr. MacDonald's attention was directed to the contradictory statements that he made in his first deposition. In his first deposition, on at least seven different occasions, Mr. MacDonald described Mr. Steadman as walking along the outside ledge of the handrail instead of using the walkway. Mr. MacDonald stated that in order for Mr. Steadman to walk on the outside of the handrail to the ladder, Mr. Steadman would have to "shuffle" or "inch" along the outside ledge while holding onto the handrail.
Mr. MacDonald admitted that in his first deposition, he stated that at the time of the accident, Mr. Steadman was "coming on the outside of the railing" with his left hand on the railing, and Mr. Steadman was attempting to step down from the railing. In the first deposition, Mr. MacDonald also stated that Mr. Steadman was on the outside ledge and was reaching for the ladder at the time of his fall.
Mr. MacDonald stated that in his first deposition, he testified that there was a walkway between the handrail and conveyor belt, but he (Mr. MacDonald) along with the other Brown & Root workers' walked on the outside ledge of the handrail. Mr. MacDonald expressed anxiety about walking along the walkway because the "escalator thing ..., made me nervous". He stated that he had heard stories about "people getting caught in the machinery and stuff happening." Mr. MacDonald admitted that at the time of his first deposition, there was no doubt that Mr. Steadman had walked along the outside of the handrail to get to the ladder.
James R. Clary, an expert in the field of structural engineering and plant safety practices, testified on behalf of Mr. Steadman. Mr. Clary stated that he went to the accident site on December 20, 1989. Mr. Clary observed a handrail with a missing top rail and a very unsteady ladder. Mr. Clary stated that he builds and designs handrails. According to Mr. Clary, handrails are designed to hold up to fifty pounds per lineal foot and a load of two hundred pounds at any one point in any direction. Mr. Clary stated that codes and the OSHA rules require a handrail to withstand at least the minimum requirement of two hundred pounds of top rail pressure with a minimum deflection. Mr. Clary stated that it is standard in a plant that if a handrail is being used as a ladder by a person weighing four hundred pounds, then the handrail should hold the person without breaking. Mr. Clary stated that the handrail should not break no matter which side of the handrail the pressure is applied from.
On cross-examination, Mr. Clary stated that based upon his knowledge of OSHA rules and regulations, it would not be appropriate for someone to be walking on the outside ledge of a handrail. Mr. Clary stated that this is not the approved method of walking along a handrail. Mr. Clary also stated that if an individual pulls on a handrail, then the lineal thrust exerted by the person can be more than two pounds.
Based upon this evidence, the jury allocated 50% of the fault to Mr. Steadman and 50% of the fault to Georgia-Pacific. After reviewing the record, we cannot say that the jury abused its discretion in its allocation of fault.

GENERAL DAMAGES
Mr. Steadman contends that the jury erred in returning a general damage award for pain and suffering which was disproportionate to the law and the evidence. Mr. Steadman asserts that the general damage award was insufficient.
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of damages is to restore the injured party in as near fashion as possible to the state she was in at the time immediately preceding injury. McCray v. Abraham, 550 So.2d 244, 248 (La.App. 4th Cir.1989). The factors to be considered in assessing quantum for pain and suffering are severity and duration. Glasper v. Henry, 589 So.2d 1173, *425 1180 (La.App. 4th Cir.1991), writ denied, 594 So.2d 1315 (La.1992).
Before a court of appeal can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its much discretion in making the award. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991). The inquiry must always be directed at whether the [jury's] award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979).
[T]he discretion vested in the trier of fact is "great", and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn v. Maritime Overseas Corporation, 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Following the accident, Mr. Steadman scheduled a doctor's appointment with Dr. L.G. Ferachi. Mr. Steadman stated that Dr. Ferachi sent him to a local hospital for x-rays. Mr. Steadman stated that he was told that his heel was shattered. Because the swelling was so severe, it was three weeks before a cast could be put on the heel. Dr. Ferachi treated Mr. Steadman from May 30, 1988, until October 17, 1988.
On June 2, 1989, Dr. J. Larry Fambrough, an orthopedic surgeon, began treating Mr. Steadman. Dr. Fambrough reviewed the medical records of Dr. Ferachi. Dr. Fambrough stated that the medical records reflected that Mr. Steadman was diagnosed with a left heel fracture, and that Dr. Ferachi treated Mr. Steadman conservatively with compression dressing and analgesics for pain control.[2]
At his initial visit with Dr. Fambrough, Mr. Steadman complained of continued pain over the outside of his ankle. Dr. Fambrough found that the majority of the pain experienced by Mr. Steadman was in the ankle area of his peroneal tendons. Dr. Fambrough performed a clinical examination, and the results showed a widening of the hind foot and tenderness on the peroneal tendons. Dr. Fambrough also x-rayed the heel and found some subtalar arthritis. Dr. Fambrough recommended conservative management with Mr. Steadman continuing his everyday activities, utilizing good footwear and taking anti-inflammatory medications. On this visit, Dr. Fambrough suggested that if the time ever came where Mr. Steadman could not tolerate the pain, then Mr. Steadman's next option was subtalar fusion.
Mr. Steadman had subsequent office visits with Dr. Fambrough on July 19, November 10, and November 27, of 1989. Mr. Steadman continued to complain of pain over his ankle, and Dr. Fambrough continued to treat him with anti-inflammatory medication. By April of 1990, Mr. Steadman still had the same complaints of ankle pain, and Dr. Fambrough discussed options of conservative treatment versus surgical treatment. Dr. Fambrough referred Mr. Steadman to Dr. Ferachi for his opinion and recommendation on Mr. Steadman's future treatment. On April 11, 1990, Mr. Steadman was examined by Dr. Ferachi, and Dr. Ferachi recommended that Mr. Steadman have subtalar arthrodesis, which is a fusion of the subtalar joint.
Mr. Steadman was not seen by Dr. Fambrough again until July 3, 1990. At this point, Dr. Fambrough felt that Mr. Steadman's symptoms were not severe enough to recommend surgery. On this visit, Mr. Steadman had a minimal limp and was responding fairly *426 well to his medication. Dr. Fambrough recommended that Mr. Steadman continue with the same treatment of medication and return if his condition deteriorated. On September 14, 1990, Mr. Steadman was given a prescription by Dr. Fambrough for some heavy-duty, hightop lace-up boots.
Dr. Fambrough did not see Mr. Steadman again for complaints of pain over his ankle until November 20, 1991. Mr. Steadman had symptoms of peroneal tendonitis and was treated with medication. Mr. Steadman's next visit with Dr. Fambrough was in July of 1993. On this visit, Dr. Fambrough noted that Mr. Steadman had chronic subtalar arthritis in his fracture. Dr. Fambrough did not recommend surgery.
Mr. Steadman's next visit with Dr. Fambrough occurred on September 12, 1994. Mr. Steadman complained of pain when he stood on his feet for long periods of time, and Mr. Steadman had no detectable subtalar motion. Dr. Fambrough's diagnosis was subtalar arthritis secondary to a heel fracture (comminuted calcaneal fracture). Dr. Fambrough opined that Mr. Steadman would continue to have flare ups of peroneal tendonitis, which would be intermittent and chronic in nature. Dr. Fambrough opined that the lack of subtalar motion would not affect Mr. Steadman's walking on even surfaces but would cause him pain when walking on uneven surfaces. Dr. Fambrough further ascribed a four percent permanent partial disability for the lack of motion (ankylosis of the joint). According to Dr. Fambrough, if Mr. Steadman's pain and discomfort were included with his permanent partial disability, then he had a disability of seven to eight percent. Dr. Fambrough recommended that in the future, Mr. Steadman continue to use good, supportive, lace-up high-top shoes and anti-inflammatory medications.
Mr. Steadman testified that his left foot loses mobility and does not work right. Mr. Steadman stated that he has bad pain in his foot when he walks on uneven surfaces, and he has been unable to find permanent employment that he could perform safely and comfortably as an industrial electrician. Prior to the accident, Mr. Steadman liked to do lawn work, woodworking, metal working and building things. Mr. Steadman also liked to hunt, fish and scuba dive. Mr. Steadman stated that since the accident, his hobbies have "pretty much ceased". Mr. Steadman stated that he does not enjoy doing things anymore because of the pain.
Mrs. Steadman testified that prior to the accident, Mr. Steadman was very active and in good health. Mrs. Steadman stated that before the accident, she and Mr. Steadman would go bicycle riding and walking. According to Mrs. Steadman, when Mr. Steadman wakes up in the morning, he cannot put all of his weight on his foot, and sometimes his foot is so swollen he cannot put on socks or slippers. In the early morning, Mr. Steadman hobbles around on his foot. Mrs. Steadman testified that Mr. Steadman wears prescription shoes all the time, and because either his leg or foot bothers him, he does not sleep well at night. On the weekends, Mr. Steadman usually rests and is not very physical. Since the accident, Mr. Steadman comes home from work irritable, non-talkative and very nervous.
After considering the evidence, we cannot say that the jury abused its vast discretion by awarding $40,000.00 in general damages.

FUTURE LOST EARNINGS OR EARNING CAPACITY
Mr. Steadman argues that the jury erred in not awarding damages for lost future earnings/lost future earning capacity.
Earning capacity is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979). Such damages are calculated on the person's ability to earn money rather than on what he actually earned before the injury. Harris v. Pineset, 499 So.2d 499, 505-06 (La.App. 2nd Cir.1986), writs denied, 502 So.2d 114, 117 (La.1987).
Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. The courts must exercise *427 sound judicial discretion in determining these awards and render awards which are consistent with the record and which do not work a hardship upon either party. Daigle v. United States Fidelity and Guaranty Insurance Company, 94-0304, p. 17 (La.App. 1st Cir. 5/5/95), 655 So.2d 431, 442.
Factors to be considered in determining a proper award for loss of future income are the plaintiff's physical condition before and after the injury, the plaintiff's past work history and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650, 658-59 (La.App. 2nd Cir.1984).
Mr. Steadman testified that following the accident, he continued to work as an industrial electrician and worked at over forty electrical jobs. Mr. Steadman stated that he worked in pain because he had to pay his bills. Mr. Steadman testified that since the accident, his earnings have increased, and he has been consistently employed. However, Mr. Steadman stated that he has not been able to find a permanent job with the ideal conditions recommended by Dr. Fambrough.[3] Mr. Steadman's income tax returns for 1989 through 1993 were introduced into evidence. These returns reflected the following wages: 1989, $26,313.00; 1990, $30,627.00; 1991, $51,902.00; 1992, $26,047.00; and 1993, $36,765.00.
Dr. Fambrough opined that Mr. Steadman's condition after the accident would remain basically the same with minimal deterioration due to the aging process. Dr. Fambrough stated that Mr. Steadman had never told him that he could not perform his work duties. Dr. Fambrough did not suggest that Mr. Steadman stop working because some people are able to work with some discomfort. Dr. Fambrough also found no functional disability because Mr. Steadman continued to work.
Dr. Cornelius Gorman, a vocational rehabilitation specialist, evaluated Mr. Steadman in April of 1991 and in October of 1994. Prior to his April, 1991 evaluation, Mr. Steadman was taking three ansaid (an anti-inflammatory drug) tablets every morning before going to work and had to work with the use of prescription shoes. Mr. Steadman was not on any pain medication. Mr. Steadman told Dr. Gorman that because of the pain, he sometimes could not work a full day or would need help with work. After evaluating Mr. Steadman in April, 1991, Dr. Gorman recommended that Mr. Steadman persist in his present employment as long as possible. Dr. Gorman also recommended that Mr. Steadman give strong consideration to alternative employment as a vocational teacher. Dr. Gorman felt that this was a reasonable alternative occupation for Mr. Steadman that was within Dr. Fambrough's recommended work restrictions.
Dr. Gorman evaluated Mr. Steadman again in October, 1994, and discussed with him the restrictions placed on his work activities by Dr. Fambrough and the expense of using prescription shoes for work. At this point, Dr. Gorman felt that Mr. Steadman was not promotable in his profession because of his injury. Dr. Gorman opined that Mr. Steadman would do well as a technical school trainer or teacher. At trial, Dr. Gorman opined that based upon the medical testimony of Dr. Fambrough, Mr. Steadman should change his occupation at this time. Dr. Gorman stated that if Mr. Steadman would change his occupation to teaching, then his earnings would decline to an entry-level of $22,000.00 a year, and his earnings would peak at $29,000.00.
On behalf of Mr. Steadman, Dr. Randolph Rice, a professor of economics, testified that at the time of trial, Mr. Steadman was forty-eight years old, his life expectancy was 28.14 years, and his work life expectancy was 16.04 years. Dr. Rice stated that Mr. Steadman had a college degree and continued to work and earn wages as an industrial electrician after his May, 1988 accident. Dr. Rice reviewed *428 Mr. Steadman's income tax returns from 1989 to 1993. Dr. Rice used Mr. Steadman's 1994 earnings as an electrician as his potential yearly earnings. At the time Dr. Rice determined Mr. Steadman's 1994 earnings, Mr. Steadman had actual earnings of $41,048.00 as of November 26, 1994. Based upon this November, 1994 earnings figure, Dr. Rice calculated Mr. Steadman's annual earnings for 1994 as $43,904.00. Thereafter, Dr. Rice considered Mr. Steadman's potential yearly earnings as $43,904.00.
Dr. Rice stated that in determining Mr. Steadman's future lost earnings, he considered Dr. Gorman's opinion that Mr. Steadman change his occupation to a vocational teacher with an annual salary of $22,000.00, Mr. Steadman's potential yearly earnings of $43,904.00, and his work life expectancy of 16.04 years. Based upon these considerations, Dr. Rice calculated Mr. Steadman's future lost earnings as $283,620.00. Dr. Rice stated that in arriving at this figure for future lost earnings, he used a discount factor of 7¼% and a cost of living increase of 4½% per annum.
On cross examination, Dr. Rice admitted that only if those events that he based his calculation on occurred, would Mr. Steadman suffer the determined future lost earnings. Dr. Rice also admitted that if these events did not occur, then his calculations of Mr. Steadman's future lost earnings would have to change. Dr. Rice admitted that if Mr. Steadman continued to work as an industrial electrician and continued to earn in the range of what he had earned from 1989 forward, then he would have no future lost earnings. Dr. Rice also admitted that in the nature of the work of an industrial electrician, there are fluctuations in an individual's income, and Mr. Steadman's income had fluctuated for the last several years.
Based upon Mr. Steadman's 1992, 1993, and 1994 earnings, Dr. Rice determined Mr. Steadman's average yearly earnings as $35,572.00. Dr. Rice admitted that if Mr. Steadman's future earnings were within the range of his 1992-1994 average earnings, then Mr. Steadman would suffer no future lost earnings. Dr. Rice stated that his use of Dr. Gorman's assumption of a career change to a teaching position with a entry level salary of $22,000.00, did not take into consideration Mr. Steadman's potential to earn additional income by a night contract as a vocational teacher or as a contracted electrician or air conditioning worker on weekends and in the summer.
Based upon the evidence, we cannot say that the jury abused its discretion in failing to award damages for future lost earnings.

ASSESSMENT OF COURT COST
Mr. Steadman contends that the trial court erred in assessing the court costs equally between him and Georgia-Pacific.
While it a general rule that the party cast in judgment should be taxed with costs, the trial court may assess costs of a suit in any equitable manner. See LSA-C.C.P. art. 1920; Polk Chevrolet, Inc., v. Webb, 572 So.2d 1112, 1116 (La.App. 1st Cir.1990), writ denied, 575 So.2d 394 (La.1991). Upon review, a trial court's assessment of costs can be reversed by this court only upon a showing of an abuse of discretion. Polk Chevrolet, Inc., v. Webb, 572 So.2d at 1116.
After a thorough review of the record, we cannot say that the trial court abused its discretion by equally assessing costs between Mr. Steadman and Georgia-Pacific.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Darwin Steadman.
AFFIRMED.
NOTES
[1] Judge Hillary Crain, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Dr. Fambrough also testified that the medical records reflected that by September 19, 1988, Mr. Steadman was allowed to return to work, and by his October 17, 1988, visit with Dr. Ferachi, Mr. Steadman was still having pain and walking with a limp. At that point, Dr. Ferachi recommended that he continue to work and start wearing a high-top, lace-up boot for support.
[3] The job conditions recommended by Dr. Fambrough are intermittent sitting and standing, walking about no more than fifteen or twenty minutes at a time, walking on a soft surface, wearing cushioned shoes, no climbing, and walking on a level terrain.