809 So.2d 344 (2001)
Terry L. LASYONE
v.
KANSAS CITY SOUTHERN RAILROAD, State of Louisiana Through DOTD and the Parish of Pointe Coupee Through Its Governing Authority, the Police Jury of Pointe Coupee Parish
No. 1999 CA 0735R.
Court of Appeal of Louisiana, First Circuit.
September 28, 2001.
Writ Denied March 15, 2002.
*345 Craig S. Watson, Walter Landry Smith, Baton Rouge, for Plaintiff-Appellee Terry L. Lasyone.
Robert C. Funderburk, Jr., Arthur H. Andrews, Baton Rouge, for Defendant-Appellant DOTD.
*346 Bobby S. Gilliam, Shreveport, for Defendant-Appellant Kansas City Southern Railway Company.
Kenneth W. Benson, Baton Rouge, for Intervenor-Appellee Liberty Mutual Insurance Company.
Before: CARTER, C.J., PETTIGREW, and DOWNING, JJ.
PETTIGREW, Judge.
This case is before us on remand from the Louisiana Supreme Court. We had previously considered this appeal and rendered judgment on June 23, 2000, reversing the trial court's finding that a guardrail installed by the Louisiana Department of Transportation and Development ("DOTD") at a train crossing on Louisiana Highway 1 posed an unreasonable risk of harm to the plaintiff, Terry Lasyone. The trial court imposed 50 percent of the fault for this accident to DOTD and 50 percent to Mr. Lasyone. In an unpublished decision, this court reversed the trial court's judgment and assigned 100 percent of the fault to Mr. Lasyone. Lasyone v. Kansas City Southern Railroad, 1999 CA 0735 (La.App. 1 Cir. 6/23/2000). In Lasyone v. Kansas City Southern Railroad, 2000-2628, p. 23 (La.4/3/01), 786 So.2d 682, 699, the Louisiana Supreme Court reversed our earlier decision, reinstated the trial court's judgment, and remanded the matter to us for appellate review of the damages awarded to Mr. Lasyone by the trial court.

DAMAGES AWARDED BY THE TRIAL COURT
This case proceeded to a three-day bench trial in March and June of 1998, after which the trial court took the matter under advisement. On October 7, 1998, the trial court rendered judgment, along with written reasons for judgment, finding DOTD to be 50 percent at fault in causing injury to Mr. Lasyone and awarded damages as follows:

Past, present and future physical pain
 and suffering and mental anguish $2,500,000.00
Past medical expenses $ 85,543.60
Future medical expenses $ -0-
Past loss of earnings $ 156,931.00
Future loss of earnings $ 217,694.00
 TOTAL: $2,960,168.60

The court ordered that the damage award be reduced by 50 percent for Mr. Lasyone's comparative fault, resulting in a final damage award of $1,480,084.30, together with interest from the date of judicial demand until paid.[1] It is from this judgment that DOTD appealed, assigning two specifications of error concerning quantum. DOTD argued that (1) the damages awarded by the trial court were grossly excessive, and (2) that the trial court committed legal error in awarding future loss of earnings because, at the time of trial, Mr. Lasyone was earning double his pre-injury income.

STANDARD OF REVIEW
It is well settled that the trier of fact has much discretion in awarding damages. La. C.C. art. 2324.1. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion of the trier of fact is `great,' and even vast, *347 so that an appellate court should rarely disturb an award of general damages." The appellate court's first inquiry should be "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact." Youn, 623 So.2d at 1260. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn, 623 So.2d at 1261.

GENERAL DAMAGE AWARD
There was extensive medical testimony and evidence offered to the trial court concerning the multiple injuries sustained by Mr. Lasyone as a result of this incident on October 20, 1986.[2] The majority of this evidence was presented by Mr. Lasyone's treating orthopedic surgeon, Dr. Lawrence J. Messina. Dr. Messina first saw Mr. Lasyone on the day of the accident in the emergency room of Our Lady of the Lake Hospital in Baton Rouge, Louisiana. According to Dr. Messina, Mr. Lasyone had sustained a severe compound fracture of his right femur, a fracture of his left elbow bone, a fracture of his left fibula, and bilateral fractures of his ankles. Mr. Lasyone was immediately taken to surgery, where he underwent a debridement and application of an external fixation device to his right femur, as well as an internal fixation of his elbow fracture and a closed reduction and casting of the left ankle fracture.

Compound Fracture of Right Femur
During Mr. Lasyone's initial ten-day hospitalization, he developed an infection in his right leg and underwent several surgeries for debridement of the right femur wound. Eventually, Dr. Messina was able to obtain wound closure. Dr. Messina described the injury to Mr. Lasyone's right femur as almost being a traumatic avulsion, in that he had a nearly circumferential laceration of his leg and the thighbone was exposed through the laceration. The only thing holding the leg intact was a small portion of the posterior musculature of the thigh with the sciatic nerve. Dr. Messina added, "It was a big-time injury."
The external fixation device on Mr. Lasyone's right leg remained in place until December 9, 1986, when it was surgically removed, and a cast brace was applied. Thereafter, Mr. Lasyone began experiencing many unexpected problems with his right leg. According to Dr. Messina, there was never a good union of the femur bone, thus preventing the fracture from healing. In March 1987, Dr. Messina performed another operation on Mr. Lasyone's right femur, wherein he inserted an intramedullary nail down the center of the thighbone. Bone was also taken from the iliac crest, and a bone graft was impacted around the fracture site.
As Mr. Lasyone's fracture began to heal, he formed adhesions of the quadriceps muscle, i.e., muscles of the thigh bone, leaving him unable to bend his knee past 50 degrees. Physical therapy was unsuccessful in regaining range of motion in his knee. In May 1987, Mr. Lasyone underwent a quadricepsplasty, which is the process of removing the scar tissue and freeing up the quadriceps muscle from the underlying bone. Postoperatively, he was placed in a continuous passive motion machinery *348 that kept his knee moving to prevent the scar tissue from building up again. As a result of this surgery, Mr. Lasyone's knee flexion was increased to 85 degrees. Dr. Messina explained that normal knee flexion is 135 degrees.
By the summer of 1987, x-rays revealed that the femur fracture was healed. Mr. Lasyone had been attending physical therapy, was able to walk without a limp, and had flexion up to 90 degrees. However, Mr. Lasyone's right leg was left 1½ inches shorter than his left leg. Dr. Messina sent Mr. Lasyone to Baton Rouge Physical Therapy for a work hardening program. He finished the program on October 6, 1987, with a recommendation from his physical therapist that he return to work as a truck driver. Dr. Messina saw him on October 7, 1987, and released him to return to work. However, in late 1987, Mr. Lasyone began experiencing numbness and sensory deficits in his right leg. Dr. Messina explained that there was nothing that could be done to cure this sensory nerve problem and that Mr. Lasyone would have to learn to live with it. Furthermore, Mr. Lasyone developed bursitis in his hip from the intramedullary nail. The nail was later removed in a March 1988 surgical procedure.
Dr. Messina saw Mr. Lasyone again in February 1989 at which time he was complaining of numbness in his right leg and problems with his right knee. At that time, he was diagnosed with chrondomalacia or softening of the articular cartilage of the inner surface of the kneecap. Dr. Messina believed this resulted from the weakness that Mr. Lasyone had in his quadriceps muscle and prescribed a knee brace to help increase the strength of the muscle.
Mr. Lasyone began experiencing back problems in July 1993. He complained to Dr. Messina that his back bothered him when he tried to walk or stand. Dr. Messina opined that Mr. Lasyone had chronic low back pain that was mechanical in nature because of the leg length inequality that resulted from the fractured right femur. Dr. Messina indicated that he had given Mr. Lasyone a lift for his shoe to help lessen the leg length inequality. Mr. Lasyone's back continued to worsen throughout 1993, and he was given cortisone injections for symptomatic relief. Dr. Messina also recommended physical therapy. Because of the low back pain that he was experiencing when he drove his truck, Mr. Lasyone began working only part-time. Dr. Messina advised Mr. Lasyone that it would be in his best interest to find another occupation.
Mr. Lasyone continued to complain of low back pain over the next several years. X-rays taken in 1995 revealed that he had spondylolysis at the L5 level. Dr. Messina continued to treat him conservatively with medications and intermittent cortisone injections. In 1996, he was diagnosed with retrolisthesis between L4 and L5. Dr. Messina described this as a sign of the settling of a disc with backward translation of the L4 vertebrae in relationship to the L5 vertebrae. Again, Dr. Messina related this to the excessive stresses placed on Mr. Lasyone's back because of his leg length inequality. Mr. Lasyone's complaints of back pain remained the same through February 1998. Dr. Messina explained that Mr. Lasyone had been left with a residual weakness because of the shortening of his right leg. Dr. Messina could offer no solution for Mr. Lasyone's back pain and added that this would be an ongoing problem for Mr. Lasyone. At the time of trial, Mr. Lasyone still had complaints of low back pain.

Bi-Lateral Ankle Fractures
During his initial hospitalization, a short-leg cast was applied to Mr. Lasyone's left ankle. Mr. Lasyone remained in a cast for approximately six weeks after *349 his discharge from the hospital. In November 1987, it was also discovered that Mr. Lasyone had sustained a non-displaced fracture of his right ankle. As a result of these bi-lateral ankle fractures, Mr. Lasyone sustained some loss of motion in his ability to dorsiflex his ankles.
According to the record, Mr. Lasyone continued to see Dr. Messina for his ankle injuries. In April 1992, he developed tendonitis in his left ankle. As a result of this problem, Mr. Lasyone began wearing orthotics in his shoes to relieve the stress on the posterior tibial tendons. By August 1992, Mr. Lasyone was getting some pain relief from the orthotics but still had some tenderness in his right ankle. This area was injected with cortisone again at that time. Dr. Messina advised Mr. Lasyone to return on an as-needed basis for cortisone injections.
In January 1993, Mr. Lasyone continued to complain of problems with his right ankle. Dr. Messina was concerned that he might have a condylar injury so he scheduled arthroscopic surgery for both ankles on February 19, 1993. This surgery revealed condylar injuries to both ankles. Dr. Messina related these injuries to the original accident. By April 1993, Mr. Lasyone indicated that he was still having problems associated mainly with stiffness in his ankles but that he was not having near as much pain as he was having before the surgery. Dr. Messina recommended that he remain active and continue with his stretching exercises. In July 1993, he complained of swelling in both ankles and tenderness on the outside of his ankles. His ankles were again treated with cortisone injections. Mr. Lasyone continued to complain of ankle problems in August 1993. Dr. Messina opined that Mr. Lasyone had some arthritic changes that were responsible for his ankle problems and that nothing else was indicated at that time.

Elbow Fracture
After his discharge from the hospital, it was discovered that Mr. Lasyone developed a radial nerve palsy in his left arm because of the long-arm cast that had been applied to his left elbow. This condition left Mr. Lasyone unable to extend his wrist and fingers. Through range of motion therapy for his elbow, this condition began to resolve itself in January of 1987.
In November 1989, it was discovered that Mr. Lasyone had a non-union of his elbow fracture. Shortly thereafter, Dr. Messina operated on this fracture site, removing the screws from the elbow and inserting a plate with a bone graft. Dr. Messina described the bone graft as a painful procedure. Three months later, the bone graft began to dissolve. Dr. Messina did another bone graft, internally fixed the elbow fracture, and placed Mr. Lasyone's arm in a cast. At this time, Dr. Messina advised Mr. Lasyone that he should remain off of work. Mr. Lasyone's arm remained immobilized for about 12 weeks, and it appeared as though the elbow was starting to heal. After the cast was removed, Dr. Messina advised Mr. Lasyone to start working on the range of motion in his arm, but to restrict his activities accordingly. In June 1990, Dr. Messina operated yet again on the elbow, removing the plate and using a "tension band wire technique" to internally fix the elbow fracture. Mr. Lasyone's arm was again placed in a cast. As of October 1990, he was still wearing the cast and only removed it three times a day to exercise his elbow.
By January 1991, it appeared as though Mr. Lasyone's elbow fracture had healed, and his range of motion was gradually improving. At that time, Mr. Lasyone had a flexion contracture in his elbow of 30 degrees, and Dr. Messina was concerned that it might not get any better. Subsequently, *350 Mr. Lasyone developed bursitis in his elbow that was treated with anti-inflammatory medication.
In June 1991, Mr. Lasyone underwent surgery to remove the hardware from his elbow. However, even after this surgery, his range of motion was essentially unchanged. According to Dr. Messina, Mr. Lasyone "had a little bit more flexion, but his extension was still short about 27 degrees." In September 1991, he developed an infection at the surgical site on his elbow and was treated with medication. In October 1991, Dr. Messina removed a small inclusion cyst from Mr. Lasyone's elbow that had developed from the scarring he had from the surgeries on his elbow. Cultures taken from the cyst revealed that he had a staphylococcus infection that was treated with antibiotics. By November 1991, the wound from the June surgery was almost completely healed.
As of the trial date, Dr. Messina had last seen Mr. Lasyone on February 13, 1998, and had advised him to return on an as-needed basis. Dr. Messina indicated that he would continue to treat Mr. Lasyone symptomatically and did not place any restrictions on his activities. Further, Dr. Messina noted that additional surgery on Mr. Lasyone was not indicated at the time. Based on Mr. Lasyone's leg length inequality and his chronic low back problems, Dr. Messina assigned an 85 percent permanent impairment rating to his body as a whole.
In addition to the medical evidence introduced in this case, the trial court heard from Mr. Lasyone regarding the impact this accident has had on his daily life. Mr. Lasyone testified that since the accident, he can no longer run, play football or basketball, or drive a truck as a steady job. He acknowledged that he and his wife had purchased a small dump truck, but noted that he has not been able to work full-time with it. In fact, at the time of trial, Mr. Lasyone had slacked off from work because of pain in his back and ankles.
We have thoroughly reviewed the medical evidence in this case. It is clear that Mr. Lasyone has endured substantial pain and suffering stemming from the multiple injuries he sustained in the October 20, 1986. He has undergone numerous surgical procedures, endured painful physical therapy, and received many steroid injections for his different injuries. Although he is still able to remain active, Mr. Lasyone has been left with a permanent shortening of his right leg and a chronic low back condition that will likely worsen with time. He has also developed arthritis in his ankles and has weakness and loss of extension in his elbow.
In light of the nature, extent, and duration of Mr. Lasyone's condition, we find no abuse of discretion by the trial court in the damages awarded. While the general damage award in this case may be on the high side, it is not so high as to constitute an abuse of the trial court's vast discretion. Given the "particular injuries and their effects under the particular circumstances" on the plaintiff, the trial court's general damage award is not beyond that which a reasonable trier of fact could assess. See Youn, 623 So.2d at 1260. Thus, DOTD's argument in this regard is without merit.

LOSS OF EARNINGS
Recently, in Dennis v. The Finish Line, 99-1413, 99-1414 (La.App. 1 Cir. 12/22/00), 781 So.2d 12, this court discussed the much discretion afforded a trial court in setting an award for loss of future earnings.
Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Therefore, the trier of fact is given much discretion in fixing these awards. When reviewing a *351 trial court's award for loss of earning capacity, an appellate court should give deference to the trier of fact. An award of loss of future income is not based upon the difference between a plaintiff's earnings before and after a disabling injury. Rather, the award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury.
Dennis, 99-1413, 99-1414 at 35-36, 781 So.2d at 40 (citations omitted). However, because an award for past lost wages is amenable to mathematical computation based upon evidentiary proof presented at trial, the same "much discretion" rule does not apply. D'Antoni v. Winn-Dixie Louisiana, Inc., 98-1694, p. 4 (La.App. 1 Cir. 9/24/99), 754 So.2d 1093, 1096. The plaintiff bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. Daigle v. United States Fidelity and Guaranty Insurance Company, 94-0304, p. 15 (La.App. 1 Cir. 5/5/95), 655 So.2d 431, 441.
Prior to the trial of this matter, the parties entered into a stipulation concerning the deposition testimony of Dr. Randolph Rice. It was agreed that if Dr. Rice were called to testify at trial, he would provide the following figures for Mr. Lasyone's loss of earnings. With regard to past loss of earnings, Dr. Rice determined that if Mr. Lasyone had worked from the date of the accident until the date of trial and earned a weekly wage of $265.00 (an amount that had been agreed upon by the parties), he would have earned a total of $156,931.00. Concerning the future loss of earnings, the parties stipulated that the figure reached by Dr. Rice was $217,694.00. According to Dr. Rice's deposition, he based this figure on an annual income of $13,729.57, a work-life expectancy of 21.58 years, a wage growth rate of 3 percent, and a discount rate of 6 percent. Aside from the testimony from Mr. Lasyone himself, no other testimony or evidence was introduced regarding Mr. Lasyone's past lost wages or loss of earning capacity. In awarding damages to Mr. Lasyone, the trial court used the figures agreed upon by the parties prior to trial; i.e., $156,931.00 for past loss of earnings and $217,694.00 for future loss of earnings. On appeal, DOTD argues that the evidence does not support either of these awards.
With regard to the award for past lost wages, there is some merit to DOTD's argument that the evidence does not support an award of $156,931.00. As indicated, aside from the stipulation concerning Dr. Rice's testimony, the only other evidence adduced at trial was the testimony of Mr. Lasyone. According to Mr. Lasyone, he worked in 1996 and 1997, operating a small dump truck that he and his wife had purchased. By his own admission, he earned $13,000.00 in 1996 and $14,000.00 in 1997. There is no indication in the record that Dr. Rice considered this income in computing Mr. Lasyone's past lost wages. In fact, Dr. Rice testified in his deposition that he based the $156,931.00 figure on an assumption that Mr. Lasyone had not worked from the date of the accident until the time of trial in 1998. Given the evidence in the record to the contrary, it was error for the trial court not to deduct Mr. Lasyone's earnings from 1996 and 1997 from the award for past lost wages. Therefore, the award for past lost wages is amended to $129,931.00, to reflect the $27,000.00 that Mr. Lasyone earned during the two years prior to the trial of this matter.
Concerning the award of $217,694.00 for future loss of earnings, we find no abuse of discretion by the trial court. Mr. Lasyone indicated that at the time of trial, he had "[n]ot really" been working much at all because of the pain in his back and ankles. Further, Dr. Messina testified that based on Mr. Lasyone's ongoing complaints of back pain, he should *352 find other work. Dr. Messina stated, "I told him at that time that maybe it would be in his best interest to try and find some other type of occupation because I felt that he had a mechanical back problem and that I wasn't certain if there was anything more to do for that." Given this testimony and the speculative nature of this type of award, we find no abuse of discretion by the trial court in its decision to award $217,694.00 for future loss of earnings. Upon review of the record as a whole, we find ample support for the trial court's award.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is amended to reduce the award for past loss of earnings to $129,931.00. In all other respects, the judgment is affirmed. Appeal costs in the amount of $4,843.00 are assessed against DOTD.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] We note that the trial court further ordered that out of this judgment in favor of Mr. Lasyone, Liberty Mutual Insurance Company would be paid 50 percent of the $150,738.09 it had paid in workers' compensation benefits and medical benefits on behalf of Mr. Lasyone. This award was made pursuant to joint stipulation of the parties prior to trial and is not at issue now.
[2] A detailed discussion of how this tragic accident occurred is found in Lasyone, 2000-2628 at 2-5, 786 So.2d at 686-88.