861 So.2d 228 (2003)
AMERICAN CENTRAL INSURANCE COMPANY and Central Erectors, Inc.
v.
TEREX CRANE and Koehring Company.
Louisiana Workers' Compensation Corporation
v.
Terex Crane, Inc., et al.
No. 2003 CA 0279.
Court of Appeal of Louisiana, First Circuit.
November 7, 2003.
Rehearing Denied January 5, 2004.
*230 Daniel R. Atkinson, Jr., Baton Rouge, Counsel for Plaintiff American Central Insurance Company.
Edwin L. Hightower, Baton Rouge, Counsel for Plaintiff Central Erectors, Inc.
Musa Rahman, Baton Rouge, Counsel for Plaintiff-Appellee-Cross-Appellant Louisiana Workers' Compensation Corporation.
Robert E. Couhig, Jr., Leslie A. Lanusse, Raymond P. Ward, New Orleans, Counsel for Defendant-Appellant Koehring Cranes, Inc.
Kevin Patrick Monahan, Denise Ann Vinet, Baton Rouge, Counsel for Intervenor-Appellee-Cross-Appellant Louis Chapman, Jr.
Before: FOIL, FITZSIMMONS, and GAIDRY, JJ.
FITZSIMMONS, J.
Appellant/defendant, Koehring Cranes, Inc. (Koehring), appeals the jury's allocation of fault to Koehring for an accident involving a crane it had manufactured. Louis Chapman, Jr. (Chapman), appellee/cross-appellant, contests the jury's verdict for future lost wages; past, present and future pain and suffering; mental pain and suffering; disability; and loss of enjoyment of life. Following a review of the facts and law surrounding the issues in this case, we affirm.

BACKGROUND
On May 16, 1996, Central Erectors, Inc. (Central Erectors), a contracting company, was erecting a steel structure for a bus *231 station in Baton Rouge, Louisiana. A second-hand, 1970 model Lorain MC 665 crane was being utilized to lift the structural steel components of the roof. The crane, which had been purchased by Central Erectors in 1982, was manufactured by Koehring.
Louis Chapman, Sr., Chapman's father, employed Chapman as a steel worker. At the time of the incident, Chapman was positioned on the roof of the building with another steel worker, Brent Carpenter. Donnie Lee (Lee), a Central Erector employee who operated the crane, was in the process of lowering the boom of the crane so that the steelworkers could bolt a purlin to the roof, when a loud popping sound occurred in the back of the crane cab. Thereafter, Lee's application of the brakes failed to stop the boom from hitting the building. In an effort to escape being hit by the falling boom, Chapman was forced to drop twenty feet from a beam to the ground. He incurred serious injuries to his left foot and ankle, right wrist, right elbow, and thoracic spine.
American Central Insurance Company (American Central), the insurer for Central Erectors, and Central Erectors filed a petition against Koehring and Terex Crane, Inc., in which American Central sought subrogation for the cost to repair the damage to the boom of the crane. In a separate petition, Louisiana Workers' Compensation Corporation (LWCC) filed a lawsuit against Koehring and Central Erectors to recover benefits and medical expenses that it had paid to Chapman. Chapman intervened in the latter suit to recover damages resulting from the collapse of the crane's boom. Central Erectors filed a cross-claim against Koehring, as well as a third party demand in which it sought statutory employer status. The two cases were ultimately consolidated.
Following trial on the merits of the consolidated case, Central Erectors was assigned sixty-two percent fault; thirty-eight percent fault was attributed to Koehring. Damages were awarded to Chapman in the following amounts: past medical expenses, $253,204.24; future medical expenses, $304,296.00; past lost wages, $100,000.00; future lost wages, $100,000.00; past and future physical pain and suffering, $100,000.00; past and future mental pain and suffering, $40,000.00; permanent physical impairment and disability of the body, $100,000.00; and loss of enjoyment of life, $100,000.00.[1]
On appeal, Koehring asserts clear error in the jury's imposition of fault for failure to warn. Contrarily, Chapman seeks an increase in future lost wages; past, present and future physical and mental pain and suffering; permanent physical impairment; disability; and loss of enjoyment of life.

FAILURE TO WARN
Louisiana law ascribes to a manufacturer a duty to provide warning of any danger inherent in the normal use of its product which is not within the knowledge of an ordinary user. La. R.S. 9:2800.57 C; Bunge Corporation v. GATX Corporation, 557 So.2d 1376, 1384 (La. 1990). The manufacturer's duty to warn is a continuing one. Id.
*232 It was not disputed by the parties that the boom hoist brake failed when an anchor bolt securing the brake fractured. A review of the record presented on appeal presents disparate expert analyses of the etiology of the anchor bolt's fatigue failure. Norman C. Hargreaves (Hargreaves), the director of product safety for Terex Corporation, of which Koehring is a wholly owned subsidiary, opined that the bolt failure resulted because it "seized" due to a lack of lubrication of the adjacent pin. This opinion was echoed by Dr. Gerald Whitehouse, an engineer testifying on behalf of Koehring. Dr. Whitehouse stated that corrosion evidenced on the pin demonstrated the lack of a Teflon-based lubricant that resists water and heat, called "nevr-seize," in the area.
Contrarily, Michael Hames, the employee of Central Erectors responsible for maintaining the crane, testified that he had, in fact, put "nevr-seize" on three pins in the subject bracket; therefore, the bolt should have been lubricated. He also disputed the proposition that the pin was corroded or frozen to the bracket. Instead, Andrew J. McPhate, a mechanical engineer and retired professor testifying on behalf of Central Erectors, attributed the breakage of the anchor bolt to fatigue failure as a result of misalignment. In this regard, Dr. John H. Tabony, Jr., an expert in the field of mechanical and metallurgical engineering, pointed out that fatigue failure is usually a design defect. Mr. Hames noted that the problem of misalignment of the bolt was not addressed in any standard; therefore, fatigue failure could have occurred even if the machinery had been maintained in strict conformance with American National Standards Institute (ANSI) and Occupational Safety Hazard Administration (OSHA). It was additionally stated by J.D. Roberts, a board certified safety professional and safety management consultant, that conformity with the safety plan was not proximately related to the cause of the accident at issue. Finally, Professor McPhate stated that the placement of an inexpensive half-inch spherical washer would have easily corrected the misalignment and prevented the bolt failure.[2]
All parties focused on the Koehring's Lorain Operator's Manual for the MC 665 crane to buttress their case. Koehring established that Central Erectors had not complied with the OSHA and ANSI standards in its maintenance procedures. Nor had Central Erectors adhered to the inspection regimen dictated in Koehring's Lorain Operator's Manual.
Stephen A. Killingsworth, a mechanical engineer, rebutted Koehring's assertion that the accident occurred due to Central Erector's failure to properly lubricate the pins surrounding the bolt with "nevr-seize." He opined on behalf of Central Erectors that the Operator's Manual failed to address the need for application of "nevr-seize" to the boom hoist braking mechanism. Michael Hames, the employee of Central Erectors responsible for maintaining the crane, also stated that the Operator's manual had not advised the owners to put oil in the pin area.
David C. Peabody (Peabody), who had retired as an employee servicing cranes for *233 Koehring, testified that the same type of anchor eye bolt that was used in the Lorain MC 665 crane models had broken on another crane in 1985.[3] Peabody stated that he had expressly advised Hargreaves, the crane manufacturer's product safety director, about the broken anchor bolt approximately one week after it had occurred.[4]
In its consideration of a jury's determination, a court of appeal may not invalidate findings of fact unless manifest error exists. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the jury's conclusion was a reasonable one in light of the record viewed in its entirety. Housley v. Cerise, 579 So.2d 973, 976 (La.1991).
The jury evidently embraced the testimony presented by Peabody that Koehring had been warned about the failure of an anchor bolt in the past and breached a duty to attempt to notify Lorain crane owners. Our scrutiny of the Operator's Manual confirms that it did not contain specific instructions for anchor bolt maintenance or replacement. Instead, the manual states: "Certain oil can points are not specifically designated in the lubrication guides which follow. In such cases the following general instructions apply: Use oil can on all operating levers ...." Although Peabody testified that there is a soft oil hole for lubricating the anchor bolt area, he admitted that there is no reference in the Operator's Manual that addresses maintenance of the eye bolt; nor was there a part of the manual directing the owner/operator to inspect the eye bolt.
The jury could have reasonably found that the manufacturer had notice of a prior break in the same type of eye bolt on another crane. This knowledge notified the manufacturer that the anchor bolt required maintenance critical for safety. Specific attention to this integral part had not been delineated in the Operator's Manual. A manufacturer with knowledge that a machine it built could malfunction acquires a duty to warn a product user of said danger. Bunge Corporation, 557 So.2d at 1384 (quoting Winterrowd v. Travelers Indemnity Company, 462 So.2d 639, 642 (La.1985)). Thus, neglect by Koehring to advise the product user to properly examine and maintain the bolt could have resulted in the ultimate failure of the structural integrity of the anchor bolt. The jury's conclusion that Koehring failed to use reasonable care to provide adequate warning can be inferentially supported either on the basis that the Operator's Manual lacked adequate specificity relative to the necessity of lubrication of the anchor bolt area and/or prevention or warnings to prevent or correct misalignment. The establishment of a duty by Koehring to warn owners that the anchor bolt might be subject to fatigue failure is not unreasonable.[5]
Accordingly, we do not ascribe manifest error to the jury's finding that Koehring failed to use reasonable care to *234 warn Central Erectors of the possibility that the anchor bolt might fail and/or to prescribe specific maintenance directives in the maintenance manual. La. R.S. 9:2800.57 C; Winterrowd, 462 So.2d at 642-643 (La.1985). The jury did not err in ascribing a percentage of fault to Koehring.

DAMAGES
Chapman challenges the jury award of future lost wages; past, present and future pain and suffering; mental pain and suffering; disability; and loss of enjoyment of life.

Lost Future Income
Awards for lost future income are intrinsically insusceptible of mathematical exactitude. As such, the trier of fact must exhibit sound discretion in rendering awards that are consistent with the record and do not impose a hardship upon either party. Steadman v. Georgia-Pacific Corporation, 95-1463, p. 11 (La.App. 1 Cir. 4/6/96), 672 So.2d 420, 426-427, writ denied, 96-1494 (La.9/20/96), 679 So.2d 440. It is only upon an abuse of the jury's discretion that a reviewing court should disturb an award for loss of future income. See Lasyone v. Kansas City Southern Railroad, 99-0735, pp. 9-10, (La.App. 1 Cir. 9/28/01), 809 So.2d 344, 350-351. Moreover, loss of future income is not predicated on the difference between a plaintiff's earnings before and after a disabling occurrence. Instead, it is determined by the difference between the plaintiff's earning capacity before and after the injury. Dennis v. The Finish Line, 99-1413, 99-1414, p. 36 (La.App. 1 Cir. 12/22/00), 781 So.2d 12, 40.
Following trial, the jury awarded the sum of $100,000.00 as the discounted amount of future lost wages. Dr. G. Randolph Rice, an economist, opined that the discounted value for future wages ranged from $296.636.00 to $527,352.00.[6] Koehring countered that Dr. Rice's computations did not consider that Chapman had been seriously injured beforehand, nor the possibility of training in another field. In order for the jury to reject both of Dr. Rice's discounted future lost wages sums, it can be inferred that the jury relied on the testimony by Dr. Thomas Whitecloud, an orthopedic surgeon, and Michael Frenzel, a vocational rehabilitator.
Dr. Whitecloud, who treated Chapman for a spine fracture in 1991, stated that he would not have recommended Chapman's return to work as an ironworker thereafter. Dr. Whitecloud would have restricted Chapman from lifting in excess of twenty to thirty pounds, any prolonged stooping, any bending, or any climbing. Although he attributed a fifteen percent increase in the back deformity, Dr. Whitecloud did not ascribe any change in Chapman's restrictions from light work as a result of the 1996 incident.
Mr. Frenzel stated that there were available alternate sedentary jobs that Chapman could perform, with or without training.[7] Although Dr. W. Joseph Laughlin, *235 another orthopedic surgeon, testified that there was a good possibility that Chapman might ultimately lose his foot, and Mr. Frenzel admitted that he had been unaware of this possibility, Mr. Frenzel stated that he had found work in the past for an amputee. Mr. Frenzel also indicated that in the past he had placed employees, such as Chapman, who possessed a chronic need for constant narcotic pain medicine. Given Chapman's medical history and the conflicting testimony presented at trial, we cannot say that the jury's award of future loss of wages was an abuse of discretion.

General Damages
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Oliver v. Cal Dive International, Inc., XXXX-XXXX, p. 6 (La. App. 1 Cir. 4/2/03), 844 So.2d 942, 947, writ denied, XXXX-XXXX and XXXX-XXXX (La.9/19/03), 853 So.2d 638, 648. Factors to be considered are the severity and duration of the loss or pain and suffering. Fleniken v. Entergy Corporation, XXXX-XXXX, XXXX-XXXX, p. 29 (La.App. 1 Cir. 2/16/01), 780 So.2d 1175, 1194. As such, the standard of review on appeal of general damage awards is difficult to clarify and inherently nonspecific. Oliver, XXXX-XXXX at p. 7, 844 So.2d at 947. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury, to the particular plaintiff, under the particular circumstances, that the appellate court should increase or decrease the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), certiorari denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The jury awarded Chapman a total of $340,000.00 in general damages.
Chapman's injury and medical treatment were extensive. He incurred a crushed fracture of his left foot; a fractured wrist; a fractured elbow, and a fractured thoracic disc in his spine. Between 1996 and the trial, Chapman underwent at least seven operations associated with his foot and toes, including a subtalar joint fusion that necessitated bone from a bone bank. There were five separate painful procedures of irrigation and debridement associated with the foot. Several separate bone spur removals and operations for post-operative infections were necessary. Dr. Laughlin described Mr. Chapman's foot as exhibiting one of the worst os calsis fractures he had seen, noting that the bone was absolutely crushed. He also testified that with each infection and operation he had explained to Chapman the recurrent possibility of losing all his toes or his entire foot, which had not had normal blood flow since the accident. Additionally, Chapman's thoracic spine was fused from T4 to L4, and rods were inserted. Finally, Chapman's elbow was operated on twice to repair ligaments, transpose the nerve, and fix pins and plates.
$140,000.00 of the general damages award was given for pain and suffering, which the jury divided into $100,000.00 for past and future physical pain and suffering and $40,000.00 for past and future mental pain and suffering. Given the multiple surgeries, the extensive medical treatment that Chapman required, and the medical prognosis for his foot and back, the sum of $140,000.00 for pain and suffering appears low. However, when compared with other awards in the first circuit, we cannot conclude that the award distorts awards for comparable multiple injuries to the extent that a reasonable trier of fact could not assess such damages *236 for the effects of Chapman's particular injury. Nor does our review of the jury awards of $100,000.00 each for permanent physical impairment and disability of body and loss of enjoyment of life reveal that these sums were unreasonable to the extent that they should be altered.
Accordingly, the judgment of the trial court is hereby affirmed in all respects. Costs associated with this appeal are to be assessed equally to Koehring Cranes, Inc.
AFFIRMED.
NOTES
[1] LWCC's statutory workers' compensation lien was recognized. Koehring's motion for judgment notwithstanding the verdict on the issue of failure to warn, Chapman's motion for judgment notwithstanding the verdict on the issue of percentages of liability, and Chapman's motion for new trial and motion for additur as alternative to motion for new trial were denied by the trial court. Following trial, American Central and Central Erectors dismissed the property claim against Koehring.
[2] Additionally, Mr. Hargreaves testified that the accident could have been avoided by proper maintenance of the clutch on the crane. He stated that the clutch, which acts as an emergency brake, could have been successfully engaged to stop the boom when the bolt failed. Although Andrew J. McPhate agreed that the clutch could stop the boom from falling, he pointed out that it will only slow down the fall, not stop it, if the clutch were not applied immediately. The eye witness testimony indicated that the boom began to fall slowly.
[3] Following retirement from Koehring, Peabody became a crane consultant.
[4] Chapman also introduced the deposition testimony of Roy Cronon to demonstrate additional problems with an anchor bolt. Cronon attested to a breakdown of another anchor bolt on March 8, 1995 due to a "priority one breakdown[;]" however, without further evidence, the details surrounding the "breakdown" are unknown.
[5] In its denial of a motion for new trial, the court acknowledged the presentation of evidence supporting Koehring's awareness of at least one prior failure of a bolt, which would elicit a duty to warn.
[6] The low figure was reached employing an inflationary increase in the $7.50 per hour figure Chapman was earning at the time of the accident to $9.00 per hour at the time of trial. Alternately, the high sum was premised on a different inflationary rate that brought Chapman's wages to $16.00 per hour at the time of the trial.
[7] Frenzel identified auto or motorcycle mechanic work or becoming a dispatcher as a possible employment position. Although it was pointed out that Chapman's chronic need for narcotic pain medicine might inhibit his chances of obtaining alternate work if a potential employer was aware of it, the jury was free to choose to believe Frenzel's testimony that this would not necessarily prevent alternate employment.