MOON LANDRIEU, Judge Pro Tempore.
bln May 1997, Julius Clarkston, who was nine years old at the time, was struck and seriously injured by a vehicle while walking in Lake Providence, Louisiana along Highway U.S. 65. Following a jury trial, the defendant, the State of Louisiana, through the Department of Transportation and Development (“DOTD”), was apportioned twenty-percent (20%) fault based on the finding that the roadway subject of the accident site was unreasonably dangerous and contributed to the accident. In this consolidated case, the DOTD appeals the trial court judgments rendered in favor of the plaintiffs, James Clarkston, individually and on behalf of his minor son, Julius (collectively, “the Clarkstons”)1. In No. 2007-0158, the DOTD asserts several procedural errors on the part of the trial court, as well as contests the allocation of fault and the excessiveness of the damage awards. As to No. 2007-1282, the DOTD appeals the legal costs assessed against it in favor of the Clarkstons. Following a detailed review of the records in Rthese consolidated cases, we find no error on the part of the trial court and affirm in all respects.

No. 2007-0158

FACTS AND PROCEDURAL HISTORY
In 1996, the DOTD contracted with T.L. James Construction Company, Inc. (“T.L. James”) to resurface and expand approximately 1.5 miles of Highway U.S. 65, also known as Sparrow Street, in Lake Providence, Louisiana. See, DOTD Contract for State Project Nos. 020-8-0023 & 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, 7/19/96. The two-lane paved roadway is the major thoroughfare through Lake Providence, which is located in East Carroll Parish. In accordance with the contract, T.L. James commenced the road construction in the Spring of 1997 under the daily supervision and inspection of the DOTD. In the first stage, Sparrow Street was cold-planed, whereby the top two inches of asphalt were removed through rotary milling. Subsequently, T.L. James proceeded to lay hundreds of tons of asphalt as filler to rehabilitate the connective joints in preparation for the road resurfacing.
On May 17, 1997, Julius Clarkston, who was nine years old at the time, traveled with his aunt, Eddie Sue Baham,2 from New Orleans to Lake Providence to visit her parents. His sixteen-year old brother, James Clarkston, III, and nine-year old cousin, Terry Baham, accompanied them on the trip. Shortly after their arrival, the boys, along with Mrs. Baham’s twelve-year old brother, walked to another family *172member’s home approximately three blocks away. Upon learning the family member was not home, the four boys decided to return to the direction of the residence of Mrs. Baham’s parents.
|aThe boys turned from Madden Street on to Sparrow Street, which they had traveled on the first leg of their journey. Small commercial businesses are situated on one side of Sparrow Street, and residences on the other side separated from the street by a ditch approximately four feet deep and a few feet wide. Since tons of asphalt were being laid almost daily during the joint rehabilitation that was taking place in the ongoing construction, there was an absence of any permanent street markings, specifically, a center line or edge line designating the division between the roadway and the shoulder. Additionally, there were no cones, barricades, or tape situated on the site to provide guidance to the pedestrians.
Due to the ongoing construction and lack of sidewalks, the young men crossed over Sparrow Street and traveled single file along the edge of the road, which bordered the ditch. They walked, with Julius in the lead, in the direction of the traffic approaching from behind them.3 At the same time, Gina Evans was traveling north in her vehicle down Sparrow Street, in the same direction as the young men, at approximately forty-five (45) miles per hour. The speed limit in the area was ordinarily thirty-five (35) miles per hour, but was increased an additional ten (10) miles per hour by the DOTD during the ongoing construction. Ms. Evans initially noticed the pedestrians when they were approximately three car lengths in front of her. After she was able to safely pass the first three young men, she struck |4Julius with the right side of her car.4 He was ejected into the air, came down striking the windshield and, ultimately, thrown in the street head first.
Arnold Johnson, who was traveling south and approaching in a vehicle in the oncoming lane, witnessed from a distance Ms. Evans swerve and then Julius being thrown into the air. He stopped to provide emergency assistance until medical personnel arrived on the scene. Julius was rushed to Lake Providence Hospital. However, due to the severity of his life threatening head and internal injuries, he was immediately transferred on arrival to Glenwood Hospital in Monroe, Louisiana, which is located approximately one hour away.
Julius was hospitalized at Glenwood Hospital for several weeks undergoing numerous procedures and treatment for extensive injuries to his head, internal organs and leg. Subsequently, he was transferred by plane to Children’s Hospital of New Orleans (“Children’s Hospital”), where he remained for approximately two months receiving in patient therapy and rehabilitative treatment for his cognitive impairment and leg injury. Following his hospital discharge, Julius continued thera*173py at home over the course of several months. Following a brief unsuccessful attempt to return Julius to school approximately ten months after the accident, he received home schooling for the year.
lfiIn February 1998, the Clarkstons filed a tort action seeking damages against, among others, the DOTD and T.L. James.5 In October 2006, the jury trial commenced against the DOTD and T.L. James. Shortly after the commencement of the trial testimony, T.L. James reached a settlement with the plaintiffs and the trial proceeded with the DOTD as the only remaining defendant. There was extensive lay testimony, as well as expert testimony in the traffic control, road construction and medical fields.
THE TRIAL EVIDENCE

Lay Testimony

Gina Evans testified by deposition that she traveled Sparrow Street each day during the period of construction. She acknowledged the lack of a shoulder, street markings, cones, barricades, and adequate lighting. As to the day of the accident, she stated she was traveling north at forty-five (45) miles per hour when she saw Julius and other children playing in the street approximately three car lengths away. Ms. Evans noted that she was unable to avoid hitting Julius.
Arnold Johnson, a former East Carroll Parish Sheriffs deputy, testified by deposition and in person at the jury trial. He corroborated the testimony of Ms. Evans regarding the condition of Sparrow Street, which he also traveled daily. He | ^stated, as a result of the road construction, the road was dusty and visibility hampered by the constant haze of dust in the air. Mr. Johnson testified that, prior to the accident, he had even complained to his girlfriend about the fact “[tjhere were no signs and how bad the road was and how easy it could cause an accident.” Citing the absence of street markings, cones, barricades, or flashing lights in the construction zone, he asserted it was impossible to determine where the road ended and the shoulder began. Moreover, Mr. Johnson testified it was not unusual to see children walking down Sparrow Street because it was a residential area situated near small commercial business, and that the posted forty-five mile (45) per hour speed limit was seemingly excessive.
As to the day of the accident, while Mr. Johnson contended he did not see the children prior to the accident, he was sure they had not been walking or playing in the center of the street. He alleged he saw Ms. Evans approaching in a distance approximately three to four car lengths away when her car suddenly swerved and, at the same time, an unidentifiable object began “flipping” in the air. He stated he did not realize it was a child until he got closer to the accident location, when he saw Julius on the ground. Mr. Johnson maintained he tried to keep Julius, who was experiencing seizures and tremors, conscious until medical personnel arrived. He testified he was surprised Julius survived the accident because he thought the *174child was dying at the scene due to the extent of the visible injuries.
Terry Baham, Jr., Julius’ cousin, testified that, on the day of the accident, Sparrow Street was covered in rocks and gravel and absent any street markings. He 17alleged they were walking in a single file at arms length distance between them, with him directly behind Julius, when he heard Ms. Evans’ vehicle approach from the rear. Terry stated that, by the time he flinched to the side and turned his head, Julius had already been hit and was coming down head first into the ground. He testified Ms. Evans was driving fast with her vehicle being close enough to touch when passing them.
Julius’ older brother, James Clarkston, III, corroborated Terry Baham’s testimony that they were walking in a single file line. James stated that he was last in line and, when he first noticed Ms. Evans’ vehicle, it was approaching “pretty fast”. He alleged he had no time to instruct the others about moving out of the way. He claimed, by the time he “flinched” to the side, Julius had already been struck and landed in a disfigured position with his feet at his head. James also corroborated his cousin’s testimony that, following impact, Julius was shaking and foaming at the mouth, and his eyes rolled back. While he was unable to remember many specific details about his brother’s medical treatment that had taken place almost ten years prior to trial, James stated that he helped his brother with his rehabilitative therapy at home once Julius was discharged after months of being hospitalized. He specifically recalled, over the course of several months, physically carrying his brother in their home which James said frustrated Julius since he was incapable of walking due to his body cast.
James Clarkston, Julius’ father, testified by deposition and at trial. He stated that, at the time of the accident, he was divorced from Julius’ biological mother, IsSheila Parker, and had sole custody of their three children.6 He had remarried to Marvette Clarkston and resided in New Orleans with their five children. Noting that he had traffic investigation experience due to his tenure as an officer with the New Orleans Police Department, Mr. Clarkston testified that he went to the location of the accident to reconstruct what had taken place. He stated the first thing he detected was the cold-planed street exhibiting only visible grooves and lines in the pavement covered in gravel. Mr. Clarkston stated the entirety of the area was paved with the absence of any grass due to the widening of the street. He stated he did not see any street markings, barricades, cones, or signs to provide assistance to motorists or pedestrians.
Mr. Clarkston testified, upon arriving in Monroe with his wife several hours after the accident, he did not recognize Julius, who was in a comatose state in the Intensive Care Unit. He explained his son’s head was “abnormal, very, very large” and swollen, and his left leg raised in traction. Mr. Clarkston stated his wife handled all aspects of Julius’ medical care since he had to ultimately return to work in New Orleans and care for his other children. While he knew little of the specifics regarding Julius’ treatment, Mr. Clarkston claimed Julius’ condition worsened for a significant period of time before it got better. He testified, when his son’s medical condition improved months later, Julius would communicate with nonverbal gestures since he was unable to speak. Mr. Clarkston expressed that he was unaware if Julius even knew who he was. He specifically recalled his 19son was being treat*175ed for an extensive period of time with Dilantin, as a prophylactic measure for seizures. Mr. Clarkston testified that he also limited his son’s physical activity in the first several years after the accident so as to avoid an injury to the fractured leg.
Mr. Clarkston testified that, prior to the accident, Julius was a “normal nine-year old.” He claimed, as a result of the accident-related limitations, his son exhibits frustration, anger, and aggression. Mr. Clarkston stated Julius caused considerable problems in the home to the point his siblings feared him. He noted, once Julius was able to return to school over a year after the accident, his son had behavioral and academic problems, resulting in several school transfers and his having to repeat the sixth grade. Mr. Clarkston testified that, on the one occasion he tried to seek psychiatric care for Julius, it was requested he admit Julius on an inpatient basis at a psychiatric facility. He alleged he was uncomfortable with the suggestion and refused based on his law enforcement experience. Mr. Clarkston testified he felt it was his responsibility to teach Julius how to accept his limitations and manage his anger in a non aggressive manner. Specifically, he stated he taught Julius how to “retreat” when his son becomes frustrated. Mr. Clarkston expressed that, while his son is coping with his unpredictable mood swings and impulsive behavior, he regretted that it has resulted in Julius becoming more withdrawn and socially isolated through the years. He opined that, while his other children have or will attend college, he did not foresee such for Julius due to the cognitive limitations resulting from his injuries. In support, he explained his |inson exhibits considerable difficulty processing information that is read, resulting in comprehension difficulties.
Marvette Clarkston, Julius’ stepmother, testified that she was Julius’ primary caregiver during the period relative to his medical treatment and rehabilitation. As such, she was able to recall with great specificity aspects of her stepson’s medical condition and treatment. Mrs. Clarkston stated, when she first arrived at the hospital, she was advised Julius’ prognosis was not good. Due to the severity of the head injury, Julius was placed in a drug-induced coma for several weeks and on a ventilator due to his collapsed lungs. She contended he underwent several surgical procedures for placement and subsequent removal of a metal bolt in his head to reduce swelling stemming from the fluid on the brain. Moreover, she stated that a bronchoscope was done to drain fluid out of his lungs. Mrs. Clarkston contended Julius was unresponsive when he was taken out of the coma after several weeks. Specifically, he had no motor control, which included being unable to speak or walk; nor did he recognize any person or object. She testified that, until Julius’ head and internal injuries stabilized, the physicians were unable to put a'cast on his body to resolve the orthopedic problems. Mrs. Clarkston stated a spina cast, a cast from the waist down to the feet with a pole between the legs, was put on Julius immediately prior to him being transferred by a private plane to Children’s Hospital for rehabilitation.
As to Julius’ condition upon arriving at the pediatric hospital in New Orleans, Mrs. Clarkston described her stepson as being a newborn baby with an Ininability to eat or walk, as well as suffering from a loss of coordination and bowel control. She contended his cognitive impairment resulted in delayed speech and an inability to recognize objects or persons. Specifically, Mrs. Clarkston maintained Julius was diagnosed with aphasia, the inability to mentally associate the word for an object. Moreover, she contended Julius had permanent memory loss of his life prior to the accident. As a result of these condi*176tions, Mrs. Clarkston stated Julius underwent a rigorous inpatient rehabilitative program over the course' of several weeks while at Children’s Hospital.
Mrs. Clarkston testified Julius underwent two orthopedic surgical procedures at Children’s Hospital. The first involved positioning of a plate and rod in the left leg to align the bones, followed by a replacement of a body cast. Approximately nine months later, Julius underwent a second surgery to remove the hardware in his leg, and then he was put back in a cast. Mrs. Clarkston testified to the limitations on Julius as a result of being in a body cast. She stated that he was unable to move or take a bath, and that he had to wear a diaper, even after he regained bowel control.
Mrs. Clarkston’s testimony regarding Julius’ mental health was similar to that of her husband and her stepson, James. She stated, for years after the accident, Julius threw temper tantrums like a child. She alleged that, even as of the time of trial, he suffers from unpredictable and impulsive behavior and mood swings, accompanied by chronic headaches. While she said his anger management has improved, he is still challenged by such, especially as it relates to his academics. 112She acknowledged Julius experienced difficulties in a school setting, particularly in the first years after the accident. She opined his fighting stemmed from his frustration relative to his cognitive limitations and being mocked by the other children. Mrs. Clarkston agreed with her husband that Julius’ management of his emotional problems has left him feeling isolated and socially inept.
Julius’s trial testimony indicated he was unable to recall anything about the accident or his medical treatment while hospitalized for several months. Moreover, he testified he had no memory of his life prior to the accident. Julius stated he unsuccessfully went back to school for a very short period of time while on crutches, but was unable to maneuver due to the lengthy body cast. As such, he was home schooled for a period of time by special tutors. Julius conceded he was subject of disciplinary problems and expelled from two schools for fighting. While admitting he had a temper problem, Julius stated he engaged in altercations because children mocked him about the bald spots on his scalp resulting from the accident-related scarring. Julius stated that he had several other visible scars from the accident, with the largest being on his left leg extending from his ankle to his buttocks.
The young man also testified as to other accident-related residual effects that he still suffered from as of the time of trial. Particularly, Julius stated that he experiences chronic and persistent headaches and nosebleeds. He alleged he sleeps with a towel on the side of his bed in the event of nose bleeding and is unable to sleep on his back due to gagging on blood. Additionally, he said that his left leg 113“locks up” in the wintertime. Julius admitted that he suffers from anger management and frustration problems, which are often accompanied by the chronic headaches. Specifically, he testified: “I get frustrated easy, fast. I can’t really — I can’t really tell you what goes on, because at the time, my mind just goes blank. My mind goes blank. I just focus on the person that made me angry. And, everything looks pretty much blurry around me ...”
With regard to his high school tenure at the time of trial, Julius testified he struggles with reading comprehension. Like his parents, he explained he processes information better by listening rather than reading. Julius contended he had several minor jobs while attending school, but was unable to maintain them due to his inabili*177ty to complete assigned tasks upon becoming frustrated as a result of his cognitive problems. When asked about his plans for the future, Julius maintained that, unlike his siblings that have excelled in academics, he thinks he is unable to attend college due to his cognitive limitations. He stated that he would like to engage in a hands-on training program, and possibly enter the military or start his own business.

Highway Reconstruction and Maintenance Testimony

Johnny Matthews, III, a DOTD construction inspector, testified that he was on the U.S. 65 reconstruction site each day and prepared the project diary, wherein he recorded the contractor’s daily activities. He contended it was his responsibility to make sure T.L. James was performing in accordance with the plans and specifications drafted by DOTD. While Mr. Matthews stated his logs throughout | uthe entirety of the project indicated appropriate signs and barricades were in place at the construction site, he acknowledged none were put in place in the area of the accident location.
Mr. Matthews stated that, on May 16, the day prior to the accident, approximately 35.6 tons of asphalt were laid down. Moreover, he alleged temporary center line markings were placed down, which was corroborated by the project diary. He further testified that, on the following day, the day of the accident, approximately 40.43 tons of asphalt were utilized for joint repairs, but no line markings were placed down. While Mr. Matthews admitted that asphalt generates considerable debris, he was unable to show on the project summary that the area had been cleaned of debris for the two days prior to and the day of the accident. Moreover, although he conceded that no accommodations were made for pedestrian traffic throughout the entirety of the project, he further stated that he did not believe T.L. James was contractually obligated to provide for such. Mr. Matthews testified that he was familiar “to some degree” with the Louisiana Standard Specifications for Roads and Bridges (“LSSRB”) and had “very little” knowledge of the Manual on Uniform Traffic Control Devices (“MUTCD”). When he was advised they were attached and incorporated into the DOTD’s contract with T.L. James and provided the minimum safety requirements provided by law, he admitted he had no knowledge of their mandates relative to the cleaning |1fiof debris, placement of markers and controlling pedestrian traffic in construction zones.7
*178Gary Dean Icenogle, a DOTD engineer, was the project supervisor on the Sparrow Street project. Upon reference by the Clarkstons’ counsel to page D-3 of the contract at issue, Mr. Icenogle conceded T.L. James, under the supervision of the DOTD, was required to provide on the site temporary street markings, signage and barricades at the end of each work day on the overlay project.8 He testified that the DOTD and T.L. James had an obligation to maintain and control traffic at |1fiall times on the site, whether work was being performed at the time or not. Mr. Iceno-gle also acknowledged the contract mandated that T.L. James comply with the requirements of the LSSRB and the MUTCD, particularly those relative to street cleaning and the provision of accommodations for pedestrian travel. Notwithstanding, Mr. Icenogle testified the project diaries did not indicate any measures were taken to clean the street after approximately eighty (80) tons of asphalt were laid the day before and the day of the accident. Moreover, he also stated that no special measures were taken to separate pedestrians from the roadway, and that no edge lines were ever placed down.
James Clary, the Clarkstons’ expert in highway design, construction, safety, and maintenance, stated he used to be employed by the DOTD in the preparation of its contracts. He explained U.S. 65 was classified by the DOTD as a Class A urban arterial with a rural extension. Mr. Clary also pointed out the contract between the DOTD and T.L. James indicated the average traffic on the road was estimated to be 5,400 cars per day in 1996. Noting the area was both residential and commercial, he alleged it was foreseeable there would be pedestrian travel. Mr. Clary corroborated the testimony of Mr. Icenogle that the DOTD was obligated to comply with the mandates of the LSSRB and the MUTCD. He opined Mr. Matthews, the DOTD site inspector, should have been familiar with the LSSRB and the MUTCD requirements, and cited to several applicable provisions that were not complied with relative to traffic controls and pedestrian accommodations. Moreover, he was unable to explain why the speed limit was increased in the area 117by ten miles during the period of construction. Noting the increased speed allowed a vehicle to travel sixty-six (66) feet per second, which he described as rather substantial, he was unable to recall an instance where the increase of the regulatory speed would be appropriate for a construction site. Reviewing the project diaries, he also dismissed the DOTD’s claims that T.L. James had the proper equipment on site to clean the road. Relying on the testimony of the accident witnesses, Mr. Clary said he would have been unable to say where the *179centerline and the shoulder would be in light of the debris on the road. He testified that, based on his findings, the street was “obviously hazardous.”
The DOTD presented Joseph D. Blaschke, a consulting engineer, as their expert on highway design, traffic control and highway reconstruction. He denied Sparrow Street was unreasonably dangerous at the time of the accident. In support, he testified that he did not believe temporary edge lines designating a shoulder on the roadway were required if they would be present for less than two weeks. When asked on cross-examination where he derived his conclusion, he was unable to provide an authority. Nor could he cite support for his claims that MUTCD regulations relative to accommodations for pedestrian travel in a construction zone were not applicable due the absence of preexisting walkways and sidewalks at the site.

Medical Testimony

Dr. J.A. Bermudez, a pediatric neurosurgeon, treated Julius when he was hospitalized in Monroe, Louisiana. He testified that, at the time of admission to the emergency room, Julius’ most critical problem was perfuse bleeding from the |18head stemming from a fifteen (15) centimeter laceration ranging from one parietal region to the other. He maintained the severe trauma from the impact resulted in a skull fracture along the lambdoid suture, the cranial line which keeps the skull together. Dr. Bermuda testified that Julius suffered from significant bleeding on the left side of his brain, resulting in a decrease in the level of consciousness. He stated Julius had considerable fluid in the lungs. Dr. Bermuda also indicated the child suffered a significant injury to the left leg between the hip and the knee, as well as numerous other puncture wounds. When questioned about his entry in the medical records that Julius’ condition was “precarious”, Dr. Bermudez indicated it meant the child “could die and there was a high probability of brain damage.” He further testified that Julius’ abnormal brain waves and enlarged pupils indicated pressure was building on the brain. Based on such, he stated he conducted brain surgery where a monitor was implanted in the head to sensor brain pressure. Dr. Bermudez testified that he had not seen Julius since he was discharged from the hospital in Monroe. When questioned about Julius’ future neurological prognosis, Dr. Bermudez testified that he would not be surprised if the child had residual problems.
Dr. Joseph Nadell, a pediatric neurosurgeon and the co-director of rehabilitative services at Children’s Hospital, testified that it took approximately twelve (12) days to get Julius stable due to the severity of his brain injury and cranial fluid build up. He stated he placed the child on medication for almost a year to avert seizures. Dr. Nadell diagnosed Julius with severe memory and language delays, which he opined resulted in the mobility difficulties. Based on his findings, Julius was sent to physical, behavioral and speech therapists to address his cognitive and motor problems. Dr. Nadell stated that Julius was | ^discharged from in patient care after almost two months. He noted, at the time of discharge, Julius suffered from frontal lobe vision problems and severe language disorder. He testified the child exhibited immature and impulsive behavior. Dr. Nadell expressed specific concern over the child’s inability to make knowing and sound judgments, which he concluded raised safety issues. According to his records, he treated Julius until February 1998, where the child remained on seizure medication and suffered from memory problems. As to Julius’ future prognosis, Dr. Nadell determined Julius would have *180long-term problems with his memory and impulse control.
The defense’s expert, Dr. Meghan Ciota, a clinical and neuropsychologist with pediatric experience, testified at trial that she saw Julius on one occasion, approximately seven years after the accident. She stated she examined and interviewed the child, as well as reviewed his medical and school records. As to the battery of tests she administered to Julius, Dr. Ciota found Julius unmotivated and effortless during the testing procedures. As to the Wechsler Intelligence Scale she administered, she alleged Julius exhibited a discrepancy between his verbal and performance intelligence quotient, which she said was indicative of cognitive impairment. While Dr. Ciota noted that Julius had mild problems on his right side, which she said were indicative of a left side brain injury, she disagreed with his treating physicians as to the extent of the brain injury and impairment. She expressed Julius’s lack of motivation and poor effort contributed to the child’s poor academic performance, rather than any accident-related brain damage.
On cross-examination, Dr. Ciota conceded she was not a medical physician and would ultimately defer to Julius’ treating neurosurgeon, Dr. Nadell, as to the 12ppresence and extent of any frontal lobe damage. She also admitted Julius suffered from delayed response time, short-term memory problems, language difficulties, and impulsive behavior. Moreover, Dr. Ciota acknowledged that Julius told her when interviewed that, seven years after the accident, he still suffered from leg pains, chronic nose bleeds, headaches accompanied by fits of anger and an inability to fully manage his emotions. She testified Julius exhibited a “blunted effect”, where he lacked an ability to express emotion (i.e., smile, laughter, eye contact), which she alleged was indicative of depression. Dr. Ciota opined Julius would benefit from therapy in order to develop anger management skills.
JURY VERDICT
Following its deliberations, the jury returned a verdict apportioning fault as follows:
Gina Evans 67.5%
DOTD 20%
T.L. James 10%
Julius Clarkston 2.5%
Eddie Sue Baham 0%
Monetary damages were awarded in the following amounts:
Future Medical Expenses $ 12,000.00
Impairment of Earning Capacity 100,000.00
Loss of Enjoyment of Life 150,000.00
General Damages 1,000,000.00
The DOTD was also assessed with all costs.
The DOTD filed the instant appeal contesting the trial court’s failure to grant the DOTD’s motion for directed verdict and failure to utilize several of its jury instructions. It also cites error with respect to the jury’s allocation of fault, and the nature and amount of the damages award.
I ⅞1 DISCUSSION

Procedural Eirors

Motion for Directed Verdict

As its first assignment of error, the DOTD alleges the trial court erred in denying its motion for a directed verdict. Its motion is premised on the Clarkstons’ alleged failure to sustain its burden under La. R.S. 9:2800 when pursuing a strict liability claim under La. Civ.Code art. 2817.
In addressing this matter, we recognize the law is clear, whether one seeks a cause of action under strict liability or La.Code Civ. art. 2315 negligence, the legal analysis is essentially the same. The primary distinction is that, under strict *181liability, the plaintiff does not have to prove the owner or custodian of the thing which caused the damage knew or should have known of the potential risk involved. Campbell v. La. Dept. of Transp. & Development, 94-1052 (La.1/17/95), 648 So.2d 898, 901. However, under La. R.S. 9:2800, a plaintiffs burden is modified when pursuing a strict liability claim against a public entity (i.e., the DOTD) insofar as the plaintiff must prove “... the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the deficiency and failed to do so.” La. R.S. 9:2800.9 While we question the LgDOTD’s assertion that the Clarkstons failed to prove it had actual or constructive notice of a defect in the roadway where the accident took place and failed to remedy such, we nevertheless find the Clarkstons did not have to sustain such a burden. Surprisingly, the Clarkstons did not assert a cause of action under strict liability in its original or amended petitions. As such, La. R.S. 9:2800 is inapplicable. Therefore, we find no error in the trial court’s denial of the motion for directed verdict.

Jury Instructions

In its fourth and fifth assignments of error, the DOTD contends the trial court erred in denying jury charges 11, 12, 13, and 15 pertaining in general to driver and pedestrian responsibility and the need to exercise reasonable care. To preserve an objection to a jury instruction for appeal, a party must specifically object at trial and must articulate reasons for the objection. A general objection is insufficient. In re Asbestos v. Bordelon, Inc., 96-0525, p. 12 (La.App. 4 Cir. 10/21/98), 726 So.2d 926, 940; La.Code Civ. Proc. art. 1793(C) (“A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires, ... stating specifically the matter to which he objects and the grounds of his objection.”). Applying this principle, the record indicates the DOTD did not assert an objection to the court’s failure to include charges 1110 and 1311. As such, the DOTD waived its right to assert these charges on appeal.
12oAs to our review of the remaining instructions, it is undisputed the mere discovery of an error in jury instructions does not in and of itself justify a de novo review by this court. Rather, we must first measure the “gravity or degree of error and considering the instruction as a whole and the circumstances of the case.” Seal v. State Farm Fire Cas. Co., 00-2375, p. 4 (La.App. 4 Cir. 3/20/02), 816 So.2d 868, *182871-72. This standard of review is premised on the reasoning that a losing party-can usually find some deficiencies in the instructions to argue for a reversal. Thus, the pivotal question becomes whether the jury was misled to the extent that it was barred from dispensing justice. Id. To address such, this court must “... consider the entirety of the charges and determine if they adequately provide the correct principles of law applicable to the issues as framed by the pleadings and the evidence, and whether they provide adequate guidelines for the jury.” Seal, pp. 4r-5, 816 So.2d at 872 (citing Clark v. Jesuit High School of New Orleans, 96-1307, p. 7 (La. App. 4 Cir. 12/27/96), 686 So.2d 998, 1002-03). De novo review is only warranted when the jury charges are so incorrect or inadequate that the jury was barred from reaching a verdict based on the law and the facts. Seal, p. 5, 816 So.2d at 872.
Applying this standard, we conclude a de novo review is not warranted in this matter, as the jury instructions were not so erroneous as to bar the jury from reaching a just verdict. Accordingly, we will apply the manifest error standard of review, wherein we will review the jury instructions in their entirety and in light of the circumstances of the case. Id.
Injury charge 12 references La. R.S. 32:214 pertaining to a motorist’s duty to sound his horn and exercise proper precaution upon observing a child. Jury instruction 15 cites to La. R.S. 32:216, which provides, in the event sidewalks are not provided, any pedestrian walking on a highway shall, when practicable, walk on the left side of the highway or its shoulder, facing traffic which may approach from the opposite direction. While the DOTD does not assert how it is prejudiced by the trial court’s failure to include these jury charges, it is clearly implied the alleged error prevented the jury from reaching a reasonable verdict. We disagree.
As to jury charge 12, the jury was instructed quite extensively on the issue of the duties of a motorist. This is reflected by the jury’s allocation of 67.5% fault to Ms. Evans. Furthermore, with respect to jury instruction 15, there was significant testimony as to the absence of a designated sidewalk and the inability of the pedestrians to walk on the side of the road facing oncoming traffic. This testimony is corroborated by photographs submitted into evidence indicating the side of the road of oncoming traffic had considerable foliage barring safe pedestrian travel.
Based on these findings, we find that the jury instructions as a whole were adequate to enable the jury to reach a reasonable verdict, and the trial court’s failure to include charges 12 and 15 did not constitute reversible error.

LIABILITY

It is well settled that an appellate court may not disturb a trial court’s findings of fact unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, 1176. Upon full review of the record, the appellate court may not reverse reasonable findings, even if convinced it would have weighed the evidence differently sitting as the trier of fact. Id.
| ⅞/The DOTD contends the record is absent any evidence that it created an unreasonable risk of harm that resulted in injury to Julius. Further, while it concedes it had a duty to maintain the highway and its shoulder in a reasonably safe condition, the DOTD argues its duty did not extend to protect the minor child from the negligence of a careless driver. In addressing the DOTD’s claim, it is undisputed that *183Ms. Evans was negligent in the operation and control of her vehicle, and that her negligence was a substantial cause of the accident. She breached her duty to use reasonable care, which encompassed within it a risk that pedestrians could be present on the road she was traveling on at an excessive speed in a construction zone. Therefore, we agree with the trial court that Ms. Evans was at fault in causing the accident. See, Molbert v. Toepfer, 550 So.2d 183, 184 (La.1989). Notwithstanding, this does not dismiss the fact that other parties, including the DOTD, can also be at fault for the injuries sustained to Julius. This is premised in Louisiana’s comparative negligence scheme articulated in La. C.C. art. 2323.12 As such, we turn our attention to determining whether the DOTD was also at fault for the accident.
|2|jn their petition, the Clarkstons grounded the right to recover on the legal theory of negligence. To establish such, the Clarkstons must sustain their burden under La. C.C. art. 2315 through the application of a duty-risk analysis where they must prove the DOTD’s conduct was a cause-in-fact of the resulting harm, the DOTD owed a legal duty to Julius encompassing the risk of harm, and the DOTD breached its duty resulting in the sustained injuries. Campbell, 648 So.2d at 901-02.
As to the DOTD’s duty, the law is clear that the DOTD is not a guarantor of the safety of those who travel the highways of this state. Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La.1/14/94), 630 So.2d 1289, 1300. Notwithstanding, it is undisputed that the DOTD has a continual obligation to keep its highways and shoulders in a reasonably safe condition. Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1171-1172 (La.1986). It is DOTD’s knowledge, constructive or actual, which gives rise to the obligation to take adequate measures necessary to prevent injury. Rhodes v. State, Through Dep’t of Transp. & Dev., 95-1848, (La.5/21/96), 674 So.2d 239, 242. This duty encompasses the obligation to maintain the shoulders and the area off the shoulders within the DOTD’s right of way in such a condition that they do not present an unreasonable risk of harm to pedestrians using the adjacent roadway in a reasonably prudent manner. Lasyone v. Kansas City Southern R.R., 00-2628, pp. 7-8 (La.4/3/01), 786 So.2d 682, 690, on remand, 99-0735 (La.App. 1 Cir. 9/28/01), 809 So.2d 344. This duty also includes the obligation to protect pedestrians from any motorist who inadvertently drives onto the shoulder of the highway. Rue v. State, Dept. of Highways, 372 So.2d 1197, 1199 (La.1979). Moreover, the duty of the DOTD to maintain public roads in safe condition includes, among other things, the specific duty of providing | ^proper safeguards or adequate warnings of dangerous conditions on high*184ways. Reid v. State Through Dept. of Transp. and Development, 25,778, 25,780, p. 7 (La.App. 2 Cir. 5/4/94), 637 So.2d 618, 623. Notably, this duty extends to warning motorists of dangerous conditions in construction zones. La. R.S. 48:35. “There is no exact rule as to the types of warnings or safeguards that are required for dangerous highway conditions. Warnings should be sufficient to alert the ordinary, reasonable motorist, having in view the probable traffic, the character of the road and the use reasonably to be anticipated. Safeguards should be commensurate with the danger.” Huddleston v. Ronald Adams Contractor, Inc., 95-0987 (La.2/23/96), 671 So.2d 533, 537.
To properly execute its duties, the DOTD is guided by the Manual on Uniform Traffic Control Devices (“MUTCD”), which sets forth the minimum standards of the DOTD in the construction and maintenance of its roads and highways. Compliance with the provisions of the MUTCD, which is mandated by law, is prima facie proof of the DOTD’s absence of fault when an injured motorist or pedestrian attempts to predicate the DOTD’s liability on improper maintenance. Id. When there is evidence of noncompliance, it is not in and of itself indicative of liability. Rather, it is a relevant factor in determining the ultimate issue of whether the roadway was unreasonably dangerous.
A determination of whether the roadway at the scene of the accident was in an unreasonably dangerous condition is a question of fact and will depend on the facts and circumstances of each case. Cormier v. Comeaux, 98-2378, pp. 6-7 (La.7/7/99), 748 So.2d 1123, 1127. The trial court’s determination in this regard is factual in nature, and we evaluate findings of the trier of fact under the manifest error or clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989).
| ^Utilizing these principles, we recognize as a threshold matter that the risk of harm to Julius as a pedestrian was within the scope of protection afforded by the DOTD’s duty to maintain safe highways. Notwithstanding its duty, the evidence overwhelmingly indicates the DOTD did not comply with even the minimal standards articulated in the MUTCD relative to providing safe conditions for motorist and pedestrian travel. Moreover, the noncompliance created an unreasonably perilous roadway, which we conclude was a cause in fact of Julius’ injuries.
In support, it is undisputed the DOTD neglected to properly clean the highway the day before and on the day of the accident, after in excess of eighty (80) tons of asphalt were laid down for joint repairs. These conditions created visibility problems for Ms. Evans, while operating her vehicle. Furthermore, Ms. Evans was traveling at the posted forty-five (45) mile per hour limit. According to the uncontra-dicted testimony of the plaintiffs expert, had the DOTD left the speed limit at thirty-five (35) miles per hour, or reduced it (instead of increasing it) by ten (10) miles per hour, Ms. Evans logically would have been afforded more time to avoid the accident. Road safety was compromised by the DOTD’s increasing of the posted limit to forty-five (45) miles per hour — a speed clearly excessive for the location even in the absence of road construction, according to undisputed expert testimony. Most troubling, neither the DOTD inspector or engineer assigned to the Sparrow Street project, nor the experts retained to testify at trial, could explain why the speed limit was increased, rather than decreased, during the period of construction. Nor were the DOTD employees and experts able to recall an incident when the speed limit had ever been increased during a construction project.
*185| ¡^Finally, the record evidences there was the absence of any temporary street markings, cones, or barricades to provide guidance to motorists or pedestrians traveling in the construction zone. Each of the motorists and the pedestrians who testified in these proceedings stated it was impossible to determine where the road ended and the shoulder began. While Julius was unable to recollect the day of the accident, his brother and cousin each testified they were walking on the edge of the road and there was no other place to walk in the absence of traveling in the bordering ditch. They each testified they had to hurriedly “flinch” out of the way of Ms. Evans’ passing vehicle since it was traveling excessively and, as Terry Baham described, “was close enough to touch.” Moreover, the location in question is a rural area, in large part residential, with smaller commercial businesses in close proximity inviting walking access. As such, it was foreseeable that there would be pedestrian travel in the area.
Clearly, the DOTD constructively acknowledged the critical necessity of street markings during construction when, at the time of the drafting of the contract for the Sparrow Street reconstruction, it added language to its standard contract providing "... at the end of each day’s overlay operations, temporary pavement markings shall be in place and proper signs and barricades displayed.” [Emphasis added.]. See fn. 7, supra. The DOTD neglected to enforce T.L. James’ compliance with the contractual language, as well as the minimum requirements of the MUTCD.
The DOTD’s lack of compliance can undoubtedly be reflected in the admission of Mr. Matthews, the site inspector assigned to oversee T.L. James’ daily activities on the project, that he had no knowledge of the mandates in the Louisiana Standard Specifications for Roads and Bridges (“LSSRB”) and the |anMUTCD relative to controlling pedestrian traffic, daily cleaning of debris, and daily placement of temporary street markings. In fact, Mr. Matthews testified that he was only “familiar to a degree” with the LSSRB and had “very little” knowledge of the MUTCD, both of which had been incorporated into the DOTD contract with T.L. James of which he was delegated to ensure compliance.
In sum, the presence of barricades, cones, and temporary markings, as well as a reduced posted speed limit, are measures which would have prevented the type of collision at issue in these proceedings. As stated, we do not disagree with the DOTD’s assertion that there were causes in fact for the accident stemming from the misconduct of other parties, namely, Ms. Evans, Julius and T.L. James. However, the DOTD’s failure to implement these safety measures was undoubtedly a substantial factor in bringing about the accident and the resulting injuries to Julius. Therefore, we conclude the record supports the jury’s finding that the DOTD is liable to the Clarkstons for the damages sustained to Julius.

Allocation of Fault

Next, we turn to DOTD’s argument that in light of the evidence presented at trial, the jury was manifestly erroneous in finding it 20% at fault and in not allocating a greater percentage of fault to Ms. Evans and Julius, who were respectively assessed with 67.5% and 2.5% fault.13
*186“This allocation of shares of negligence, however, is not an easy task ..., [o, and the Louisiana [comparative fault] statute [LSA-C.C. art. 2323] does not describe with particularity how it should be accomplished.” Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 971 (La.1985). The law provides we must give great deference to the allocation of fault as determined by the trier of fact. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, 610. We are also cognizant that the allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the factfinder within that range cannot be “clearly wrong.” Foley v. Entergy Louisiana, Inc., 06-0983, p. 32 (La.11/29/06), 946 So.2d 144, 166. Only after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion. Clement, 666 So.2d at 611.
As to the allocation of fault, the trier of fact must consider the nature of each party’s wrongful conduct and the extent of the causal relationship between that conduct and the damages claimed. Watson, 469 So.2d at 971. We are directed by the factors articulated in Watson: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Id. at 974.
First, we find no error in the assessment of fault to the minor child, Julius. While his youth and inexperience could properly be considered a mitigating factor in the allocation of fault, the activity he was engaged in at the time of the accident lagdid not call for any specific skill or experience that was not within the scope of his knowledge for his age. See e.g., Id. In his capacity as a pedestrian, Julius bore some responsibility to avoid the area of construction frequented by motorists. A pedestrian simply may not freely choose to leave a position of safety and pursue a course certain to enter the path of a vehicle which is so close that it is impossible for the driver to yield. La. R.S. 32:212(B). Julius breached his duty owed to Ms. Evans that they could safely coexist on the roadway traversed by both when he became a contributing impediment to the flow of traffic.
As stated earlier, Ms. Evans’ negligence was also a substantial factor in causing the accident. The driver of a vehicle bears a greater responsibility to avoid pedestrian accidents because the consequences of his negligence potentially present an opportunity for causing the greater havoc. As stated by the Louisiana Supreme Court in Baumgartner v. State Farm Mut. Auto. Ins. Co., 356 So.2d 400, 406 (La.1978):
The operator of a motor vehicle, a dangerous instrumentality, has the constant duty to watch out for the possible negligent acts of pedestrians and avoid injuring them. A higher standard of *187care than that required of pedestrians is imposed upon the motorist commensurate with the hazards his conduct inflicts upon the public safety ...
A motorist’s duty of care includes the duty to keep his vehicle under control and to maintain a proper lookout for hazards. He must use such diligence and care in the operation of his vehicle as is commensurate with the circumstances. Edwards v. Horstman, 96-1403 (La.2/25/97), 687 So.2d 1007, 1011. As such, a motorist is statutorily obligated to exercise due care to avoid colliding -with any pedestrian upon a roadway and must give warning to the pedestrian by sounding the horn l^when necessary. Furthermore, a motorist must exercise proper precaution upon observing any child upon a highway. La. R.S. 32:214.
Applying these principles, Ms. Evans breached her responsibilities through her failure to keep a proper look out and by driving her vehicle at an excessive rate of speed, albeit the posted speed, for the dangerous road conditions. She neglected to sound her horn to provide notice to the pedestrians and, ultimately, was unable to maintain control of her vehicle.
Lastly, the DOTD also owed a duty to Julius to maintain its highway in a reasonably safe condition. As we have already articulated, there is a plethora of evidence that the DOTD failed to adequately supervise and ensure the implementation of safety measures, as well as other precautions to protect the motorists and pedestrians on the highway at issue.
In addressing the comparative liability of each of the parties, we find that a reasonable juror could conclude that Ms. Evans was in a superior position and had the last clear chance to ameliorate the risks posed by the operation of her vehicle at an excessive speed in the construction zone. There is no compelling evidence to support the DOTD’s suggestion that its fault allocation should be reduced and the percentages assessed to Ms. Evans and Julius should be increased. The district court was in the best position to evaluate the testimony and evidence, and because its findings were supported by the record and not unreasonable, reversal is unwarranted.

Damages

In its final assignments of error raised in No. 2007-0158 of these consolidated proceedings, the DOTD contests the appropriateness of the $12,000 award for future medical expenses, the $100,000 award for the impairment of 134earning capacity, the $150,000 award for the loss of enjoyment of life and, lastly, the $1,000,000 award for general damages. “The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages and in apportioning fault; the award or apportionment must be so high or so low in proportion to the injury or fault that it shocks the conscience.” Dang v. New Hampshire Ins. Co., 00-1554, pp. 7-8 (La.App. 4 Cir. 10/10/01), 798 So.2d 1204, 1209 (quoting Courteaux v. State, through DOTD, 745 So.2d 91 (La.App. 4th Cir.1999)).

Future Medical Expenses

In Molony v. USAA Property & Casualty Ins. Co., 97-1836 (La.App. 4 Cir. 3/4/98), 708 So.2d 1220, this court addressed the guidelines for awarding future medical expenses:
Future medicals need not be established with mathematical certainty although a plaintiff must prove that it is more probable than not that expenses will be incurred ... Although a plaintiff is not required to prove the exact value *188of the necessary expenses, some evidence to support the award must be contained in the record ... If the fact finder can determine from past medical expenses or other evidence a minimal amount that reasonable minds could agree upon, then an award is proper. [Cites omitted.]
Id. at pp. 2-3, 708 So.2d at 221-22.
Relying on such, the DOTD contends there is insufficient medical evidence to support the award of $12,000 for future medical expenses. It emphasizes the fact that the plaintiffs have not elected to seek medical treatment for Julius over the course of the past nine years. In addressing this issue, we first point out that the DOTD does not contest the fact that treatment, primarily, mental health treatment is warranted in Julius’ case. The testimony of Julius and his family members exhibit a striking parallel regarding Julius’ long and ongoing battle with his anger |,^management stemming from his cognitive limitations resulting from the accident. The medical testimony of Julius’ treating physicians indicated he would suffer from residual impulse control as a result of the trauma to his brain. However, it was ironically the testimony of the DOTD’s own expert, Dr. Ciota, a clinical psychologist and neuropsychologist, that formed the basis at trial for the monetary amount awarded by the jury for Julius’ future mental health treatment.14 As such, we find no merit to this claim that future medical expenses are not awardable.

Impairment of Earning Capacity

Louisiana courts have consistently held even young children are entitled to an award for loss of earning capacity. See e.g., Williams v. City of Monroe, 27,065 (La.App. 2d Cir.7/3/95), 658 So.2d 820 (award for loss of earning capacity to a six-year old affirmed); Hollingsworth v. Bowers, 96-257 (La.App. 3d Cir.12/30/96), 690 So.2d 825; (award for loss of earning capacity for newborn affirmed); Jackson v. Huang, 514 So.2d 727 (La.App. 2d Cir. 1987) (award for loss of earning capacity for newborn affirmed). Contrary to the DOTD’s assertion in its brief, awards for loss of earning capacity are speculative and cannot be calculated with absolute certainty. While there must be a factual basis in the record for the award, the trier of fact is accorded broad discretion in assessing them. Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979).
Julius and his parents each testified that, as a result of his accident-related cognitive limitations, Julius struggles in an academic environment. Each testified that, unlike his siblings, Julius would be unlikely to attend college. This was hficorroborated by the testimony and findings of Dr. Black, a neuropsychologist who examined Julius. Mrs. Clarkston and Julius both testified as to Julius’ chronic failure to maintain a part-time job for any extensive period of time. They asserted Julius’ inability to control his temper upon becoming frustrated due to his cognitive limitations in performing an assigned task significantly limited his ability to successfully thrive in an employment setting. Given the testimony of Dr. Black and the lay witnesses and the vast discretion of the jury, who had the advantage of seeing and hearing the witnesses at trial, we cannot say that the jury abused that discretion in awarding an amount for Julius’ loss of earning capacity.

*189
General Damages

Our jurisprudence has consistently held that in the assessment of general damages, much discretion is left to the jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976). The discretion vested in the jury is great, even “vast,” so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Carp., 623 So.2d 1257, 1261 (La.1993). Thus, our appellate role in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Id. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess under the particular circumstances. Id.
The testimony at trial showed that Julius, a young child at the time, was hospitalized for several months suffering from life-threatening injuries, which for a |.^significant period left him in a comatose state on a ventilator. He was subjected to innumerable intrusive surgical and testing procedures to resolve his internal and orthopedic injuries. Two surgeries were performed on Julius for implantation and removal of a bolt in his skull to reduce intracranial pressure. Undisputed medical testimony indicates Julius suffered brain damage, requiring extensive in patient rehabilitation and therapy to address his cognitive injuries. While he was able to eventually regain in large part his verbal skills, he still suffered as of the time of trial delayed speech and word association problems. Significantly, Julius experienced a permanent loss of memory of his life prior to his injury and, as of the date of trial, still suffered from cognitive limitations, resulting in memory problems and impulsive behavior. Julius testified as to his chronic nose bleeds accompanied by debilitating headaches. As to his orthopedic injuries, Julius underwent several procedures to resolve his thigh bone fracture, which included in part the surgical placement and removal of a plate and pin in the knee joint, resulting in a disfiguring scar running the entire length of his leg. As part of his rehabilitative therapy, Julius had to relearn how to walk, as well as live in a body cast for almost a year, barring his ability to move on his own volition. His cognitive and orthopedic injuries barred him from returning to school for one year, as well as ultimately resulted in barriers to fulfilling his academic potential. In sum, while $1,000,000 is a significant figure, the award is not above the limits of discretion afforded the trier of fact. Therefore, we find no abuse of discretion and will not disturb the award.
laaLoss of Enjoyment of Life
As to the loss of enjoyment of life, we find no merit in the DOTD’s claim that the award is duplicative in light of the general damage award. In doing so, we seek guidance as to the appropriateness of the award in the Supreme Court’s ruling in McGee v. AC & S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770:
Loss of enjoyment of life, sometimes known as hedonic damages, refers to the detrimental alterations of a person’s life or lifestyle or a person’s inability to participate in the activities or pleasures of life that were formerly enjoyed ...
Loss of enjoyment of life falls within the definition of general damages because it involves the quality of a person’s life, which is inherently speculative *190and cannot be measured definitively in terms of money ... ‘[T]he loss of life or life-style’ included in the definition of general damages is substantially similar to the ‘detrimental alteration of a person’s life or lifestyle’ as included in the definition of loss of enjoyment of life ... ... [L]oss of enjoyment of life is a component of general damages and therefore loss of enjoyment of life is not separate and distinct from general damages. Nevertheless, general damages in Louisiana are routinely dissected ... Thus, allowing a separate award for loss of enjoyment of life would not offend the existing concept of general damages and would reflect the accepted method of listing elements of general damages separately.
Moreover, loss of enjoyment of life is conceptually distinct from other components of general damages, including pain and suffering. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person’s life or lifestyle or the person’s inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury ...
Id., pp. 3-4, 933 So.2d at 773-775.15
| supplying McGee to the case at hand, there is no prohibition from awarding damages of loss for enjoyment of life when general damages are assessed. Contrary to the DOTD’s assertions, the Clarkstons submitted sufficient evidence for the jurors to comprehend the difference between Julius’ pain and suffering directly related to his injuries (i.e., treatment, rehabilitation, post-recovery, etc.) and his loss of enjoyment of life that stemmed from the permanent change in his lifestyle attributable to his injuries. The lay testimony indicated that Julius has learned to make accommodations in his daily life for management of his debilitating headaches, chronic nose bleeds and leg pain. He has accepted the limits on his academic prospects due to his cognitive impairment. Immediately following the accident to the time of trial, Julius has suffered from behavioral problems, leaving him frustrated and, ultimately, socially isolated in order to manage such. The DOTD’s own expert, Dr. Ciota, testified that she found Julius exhibited a “blunted effect”, where he lacked the ability to express emotion (i.e., smile, laugh, eye contact). Her characterization of Julius as being depressed was corroborated by the testimony of Julius’ family members.
Based upon our detailed review of the record, we find the trier of fact did not abuse its discretion in assessing $150,000 for the loss of enjoyment of life.

No. 2008-1282

In its only assignment in this consolidated matter, the DOTD argues that the trial court committed manifest error when it assessed the costs incurred by both 1 ^parties against it. In addition to the claims of the alleged inequity of the assessment, the DOTD urges there was insufficient evidence of the reasonableness of *191the contractual fee of plaintiffs expert, James Claver, in the amount of $4,668.40.
To address the DOTD’s claims, we rely on La. Civ. Proc. art. 1920, entitled “Costs, parties liable; procedure for taxing”, which provides:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause. Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
Thus, the general rule is that all costs, both the prevailing side’s and his or her own, are to be paid by the party cast, although the court may make an “equitable” different provision for costs. Bowman v. New Orleans Public Service, Inc., 410 So.2d 270, 271 (La.App. 4th Cir.1982). The assessment of costs against a prevailing party has been considered an abuse of discretion only when there is proof that the prevailing party incurred the costs pointlessly or engaged in other conduct that justified the assessment of costs against it. Amato v. Office of Louisiana Commissioner of Securities, 94-0082, p. 12 (La.App. 4 Cir. 10/3/94), 644 So.2d 412, 419.
A review of the record indicates the Clarkstons sought a determination of the amounts to be taxed as costs for certain expenses they incurred in the prosecution of their lawsuit. A rule to show cause was filed in order for the Clarkstons to obtain a specific assessment of the amount to which they were entitled. In support of the rule, the Clarkstons attached the affidavit of their representing counsel, accompanying the financial ledger of the attorney’s firm, attesting to the |41 compensable items of costs that had been incurred by the Clarkstons. Upon review, the trial court concluded the DOTD was to be assessed for the $19,292.45 in costs. The DOTD failed to present any evidence in opposition to the rule disputing the costs incurred by the plaintiffs. The trial court’s judgment with regard to the assessment of costs against the DOTD was within the broad discretion afforded to it. Finding no abuse of that discretion, we affirm.
DECREE
For the assigned reasons, we affirm in all respects the trial court’s judgments in these consolidated cases.
AFFIRMED.
GORBATY, J., dissents with reasons.
GORBATY, J., dissents with reasons.
Ill respectfully dissent.
Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles of Louisiana Civil Code article 2315. For liability for damages to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element); (3) the defendant’s substandard conduct was a cause in fact of the plaintiffs injuries (the cause in fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of protection element); and (5) actual damages (the damage element). Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 275-76. Duty is a question of law. The inquiry is whether a plaintiff has any law-statutory, jurisprudential, or arising from general principles of fault-to support his or her claim. Bow*192man v. City of Baton Rouge/Parish of East Baton Rouge, 02-1376 (La.App. 1st Cir.5/9/03), 849 So.2d 622, 627, writ denied, 03-1579 (La.10/3/03), 855 So.2d 315. Breach of duty, cause in fact, and actual damages are all factual issues. Snearl v. Mercer, 99-1738 (La.App. 1st Cir.2/16/01), 780 So.2d 563, 574, writs denied, 01-1319 and 01-1320 (La.6/22/01), 794 So.2d 800 and 801. Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. Whether the defendant’s conduct was a substantial factor in bringing about the harm, and thus, a cause in fact of the injuries, is a factual question to be determined by the fact finder. Bonin v. Ferrellgas, Inc., 03-3024 (La.7/2/04), 877 So.2d 89, 94; Manno v. Gutierrez, 05-0476 (La.App. 1st Cir.3/29/06), 934 So.2d 112, 117.
With reference to the allocation of fault when liability is shared by two or more defendants, Louisiana Civil Code article 2323(A) provides, in pertinent part, as follows:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined .... If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, 611. The finding of percentages of fault pursuant to the comparative fault article is a factual determination. Id. at 610. If the court of appeal finds a “clearly wrong” apportionment of fault, it should adjust the allocation, but only to the extent of | dowering or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion. Id. at 611; see also Dennis v. The Finish Line, Inc., 99-1413, 99-1414 (La.App. 1st Cir.12/22/00), 781 So.2d 12, 16 n. 12, writ denied, 01-0214 (La.3/16/01), 787 So.2d 319.
Plaintiffs argued that the DOTD was negligent because it did not provide for pedestrian traffic on U.S. Highway 65. Further, plaintiffs averred that the DOTD should have had striping in place to warn motorists of the differentiation between the road and its shoulder. However, the DOTD is not required to provide for pedestrian traffic in this area. Even so, the photographs taken at the scene showed ample area for pedestrians to walk between the road and the ditch. Gina Evans, the driver of the vehicle, testified that she saw the children coming from another street and walking on Sparrow Street before she hit them. She had notice of the situation. Hence, no striping or lack thereof played a part in this accident. Striping would not have prevented her from hitting Julius.
Nor can the DOTD be found liable under an application of the duty-risk analysis set forth in Dixie Drive it Yourself System v. American Beverage Co., 242 La. 471, *193137 So.2d 298 (1962), and Hill v. Lundin & Associates, 260 La. 542, 256 So.2d 620 (1972). The cause in fact analysis is primarily a-but-for inquiry. If the victim probably would have encountered the harm but for the defendant’s conduct, the conduct can be considered a cause in fact. Boteler v. Rivera, 700 So.2d 913 (La.App. 4 Cir.1997). A counter-factual hypothesis is recommended as a step in determining cause in fact. That is, assuming that the conduct of defendant was “corrected,” it is probable the plaintiff would still have sustained the damages complained of. If so, then the defendant’s allegedly substandard conduct was not a cause in fact. Guerra v. White, 755 So.2d 894 (La.App. 4 Cir.1999).
In the instant case, Evans testified in her deposition that Julius ran into her vehicle, and she was unable to stop. She says nothing about an inability to drive or |4a defective road. She states that there was no difficulty in determining where the road ended and the shoulder began. She had driven U.S. Highway 65 several times before the accident. She mentions nothing about dust obstructing her view.
In light of these factors, the jury’s allocation of twenty percent of fault to the DOTD was an abuse of discretion. U.S. Highway 65 did not present an unreasonable risk of harm to Julius, and alternatively, the condition of U.S. 65 was not a cause in fact of the accident. Evans noticed the children before the accident and should have exercised a higher degree of care. I would reverse this portion of the jury’s verdict, and likewise the portion of the verdict ordering the DOTD to pay all costs.
Minors who are incapable of discernment are immune from being found legally at fault. However, this freedom from fault is limited to the minor of tender age who is so incapable of discernment as to also be incapable of being legally at fault. See Turner v. Bucher, 308 So.2d 270, 276 n. 14 (La.1975) (six-year-old child); Fromenthal v. Clark, 442 So.2d 608, 609 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1242 (La.1984) (two-year-old child). The contributory or comparative fault of a child is measured not by the standard of self-care expected of an adult, but rather the self-care expected of a child of his age, intelligence, and experience under the particular circumstances presented to him. See Howard v. Allstate Ins. Co., 520 So.2d 715 (La.1988).
In determining whether a child is legally at fault, due regard must be given to the child’s age, maturity, intelligence, and knowledge, generally, and as to the particular situation involved, as well as to all the facts and the circumstances of the case, including the particular risk that produced the injury. Gremillion v. State Farm Mut. Ins. Co., 331 So.2d 130, 132-33 (La.App. 3rd Cir.1976). In the Gremillion case, a ten-year-old boy who hit his friend while swinging a golf club was found not to understand the risks and potential consequences of his action. He |5was not advanced in maturity, knowledge, or intelligence, and had failed one grade in school. The evidence did not show that he had sufficient awareness to anticipate that another child might suddenly and without warning place himself in the path of his swing, since such knowledge of children’s rash, impetuous, and careless acts is peculiar to adults. Id. at 133.
In Killough v. Bituminous Cas. Corp., 28,329 (La.App. 2nd Cir.5/8/96), 674 So.2d 1091, 1098, a boy just two days shy of his tenth birthday was found legally at fault when his leg and foot were caught in the pump while he was playing on an oil well. He had attention deficit disorder and a learning disability, yet he testified that he knew that an oil well could hurt or kill him, *194and also admitted he had been warned by his mother to stay away from the wells.
In Pritchard v. Safeco Ins. Co., 529 So.2d 449, 452 (La.App. 1st Cir.), writ denied, 532 So.2d 159 (La.1988), the First Circuit affirmed a trial court’s dismissal of a negligent supervision claim against the parents of a twelve-year-old boy, in which the trial court had concluded that a negligent supervision theory applied only to younger children, and did not apply to a child who could be independently at fault.
The legal theory whereby fault is imposed on the responsible adult due to his negligent supervision of a child applies only when the child is not old enough to appreciate the danger and to take steps to avoid it. Only in such a case does the adult have a duty to supervise the child. If the child has reached the age of discernment, where he or she knows of the danger in a particular situation or activity and also knows how to avoid that danger, then the adult has no duty to supervise that child in that situation or activity. Rideau v. State Farm Mutual Automobile Insurance Co., 2006-0894 (La.App. 1 Cir. 8/29/07), 970 So.2d 564.
The jury assigned 2.5 percent of the liability to Julius, and therefore obviously found he had reached the “age of discernment.” At age nine, he was old | fienough to understand the dangers of avoiding moving vehicles. As such, no fault can be assigned to Sue Baham for her negligent supervision of the children.
La. R.S. 32:216 provides: “It is the law of Louisiana that where sidewalks are not provided, any pedestrian walking along and upon a highway shall, when practicable, walk on the left side of the driveway or its shoulder, facing traffic which may approach from the opposite direction.” According to the language of the statute, Julius should have been walking on the left side of the highway facing the vehicles. However, Mrs. Evans testified that Julius and the other children were walking with their backs to her. She further testified that the children were running in circles on and off Sparrow Street, chasing each other. Evans stated that she slowed down to avoid the children, and gradually moved to the left to make room for them. The boys were running across the street when she hit Julius.
Julius was old enough to understand that he should not have been walking or playing in or near the street, and that he could be hit by a car if he did so. Considering his age and the testimony and evidence presented at trial, I would allocate an additional 20 percent of the fault to Julius, assigning him a total portion of 22.5 percent of the liability.
Accordingly, for the foregoing reasons, I would amend the judgment of the jury to assign 22.5 percent of the fault to Julius Clarkson, and exonerate the DOTD from any liability.

. Although Julius reached the age of majority prior to trial, his father remained a plaintiff in the instant litigation to pursue his claim for past medical expenses.

. Mrs. Baham is married to the brother of James Clarkston, Julius’ father.

. Photographs included in the record corroborated the testimony of Terry Baham, Julius’ cousin, that they were unable to walk on the side of the street, facing oncoming traffic, due to overgrown vegetation.

. Ms. Evans testified at her deposition that she struck Julius because the young men were running in the center of the street. Moreover, she testified the children were accompanied by two adults walking in the ditch that ran along the street. However, the trial testimony of Julius’ brother and cousin, as well as the eyewitness to the accident, Arnold Johnson, indicated that the boys were in fact walking in a single file along the side of the road and were unaccompanied by any adults. Based on its findings, the jury found the testimony of the young pedestrians and the eyewitness to be more credible. We find no error in this factual finding.

. In addition to the DOTD, the Clarkstons also filed suit against Ms. Evans and her insurance carrier, Louisiana Farm Bureau Casualty Insurance Company ("Farm Bureau”), as well as against State Farm Mutual Automobile Insurance Company ("State Farm”), Mr. Clarkston’s underinsured motorist carrier. The DOTD filed a claim against T.L. James and, thereafter, the Clarkstons amended their petition to also name the construction company. Subsequently, the Clark-stons settled their claims with Ms. Evans, Farm Bureau and State Farm via a concursus proceeding instituted by the insurance carriers and judgment was rendered accordingly.

. Ms. Parker passed away sometime after the accident, but prior to the trial.

. As stated the contract between T.L. James and the DOTD provides for compliance with the general highway specification manual, the Louisiana Standard Specifications for Roads and Bridges (commonly referred to as the “gold book”), which mandates safeguards for the protection on its highways. See, Plaintiff’s Exh. 9. It requires that "[t]he project site ... shall be kept reasonably free from dust and in such condition that the public can travel in safety. When the highway under construction is to be kept open for traffic, the subgrade and surfacing shall be kept reasonably free from dust and in such condition that the public can travel in safety.” Id. at 33 This includes providing, erecting, and maintaining "necessary barricades, suitable lights, danger signals, signs and other traffic control devices ... [that] shall take all necessary precautions for protection of the work and safety of the public.” Id. Finally, it provides the barricades and other safety devices are to conform, at a minimum, with the Manual on Uniform Traffic Control Devices. Id.
The Manual on Uniform Traffic Control Devices ("MUTCD”), federal guidelines adopted by the Louisiana Legislature in La. R.S. 32:235, were also incorporated in the Sparrow Street contract. See, Plaintiffs Exh. 10. MUTCD provides minimal safety requirements for DOTD's compliance. Specifically, with respect to pedestrian travel in construction zones, MUTCD provides that "[pedestrians should not be led into direct conflicts with mainline traffic moving through or *178around the work site.” It further states that a construction site should accommodate pedestrians by providing them “with a safe, convenient travel path that replicates as nearly as possible the most desirable characteristics of sidewalks or footpaths.” Id. at pp. 21-24. It also provides "... every effort should be made to separate pedestrian movement from both work site activity and adjacent traffic ... When pedestrian movement through or around a work site is necessary, the aim of the engineer should be to provide a separate, safe footpath without abrupt changes in the grade or terrain.” Id. Lastly, MUTCD states "... special warning and control devices for work areas should also be provided.”

. When drafting the contact for the Sparrow Street project, the DOTD added the following language to its standards contract: "[a]t the end of each day's overlay operations, temporary pavement markings shall be in place and proper signs and barricades displayed. During the period that all lanes are open to traffic, the contractor shall neither store material nor park equipment on the roadway shoulders.” [Emphasis added.] DOTD Contract for State Project Nos. 020-8-0023 & 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, 7/19/96, p. D-3.

.La. R.S. 9:2800, entitled "Limitation of liability for public bodies," provides in pertinent part:
(C) ... No person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the deficiency and failed to do so. [Emphasis added.]

. Jury instruction 11 pertains to the responsibility of a pedestrian on a roadway to use reasonable care and avoid the path of oncoming vehicles, relying on Bacle v. Wade, 607 So.2d 927 (La.App. 2d Cir.1992).

. Jury instruction 13 cites to Howard v. Allstate Ins., Co., 520 So.2d 715 (La.1988) for the proposition that a child, while not held to the same degree of care as an adult, is required to exercise ordinary care expected of a child of his age, intelligence and experience when facing particular circumstances presented to him.

. La. Civ.Code art. 2323, entitled “Comparative fault,” sets forth Louisiana’s comparative negligence scheme and articulates the extent to which the DOTD may be held liable to the Clarkstons, although there were additional parties at fault for Julius’ injuries. It provides in pertinent part:
(A) In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

. While the DOTD does not contest the 10% fault apportioned to T.L. James, it does urge the jury erred with respect to the failure to assess damages against Mrs. Baham, Julius’ aunt. The jury addressed the liability of Mrs. Baham relative to the lack of proper supervision of the minor child in her custody. It concluded she was negligent, but determined *186her negligence was not a cause in fact of the accident. Upon a detailed review of the record, we find the DOTD failed to present any evidence showing the actions or inactions of Mrs. Baham were a contributing factor to Julius' injuries. Finding the absence of any error in this regard, we will make no further reference to this claim.

. Dr. Ciota opined that Julius needed weekly counseling for approximately eighteen (18) months. Utilizing her rate of $160.00 per hour at seventy-eight (78) weeks, she concluded it would cost approximately $12,000, the amount awarded by the jury.

. Notably, in McGee v. AC & S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770, the Supreme Court specifically rejected this court’s earlier position that a separate award for loss of enjoyment is erroneous as a matter of law: "A majority of the lower courts have supported this position by allowing separate awards for loss of enjoyment of life ... while only the Fourth Circuit Court of Appeal has held that such an award is erroneous as a matter of law ... However, we reject the Fourth Circuit’s conclusion ...” Id.., pp. 7, 12, 933 So.2d at 776, 778.